Patrick H. Dwyer, SBN 137743
P.O. Box 1705
Penn Valley, CA 95946
Tel: (530) 432-5407
Email: pdwyer@pdwyerlaw.com
Attorney for Plaintiff Ernest Lovett

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ernest Lovett, an individual, <br><br> Plaintiff <br><br> v. <br><br> Sacramento County, California, the operator of the Sacramento County Sheriff's Department ("SCSD"); and SCSD Deputy Austin Schraeder, and Does 1-5, in their individual capacity, <br> Defendants. | CASE NO.: <br><br> COMPLAINT FOR INDIVIDUAL AND *MONELL* VIOLATIONS OF 42 U.S.C. §1983; STATE LAW CLAIMS FOR ASSAULT, BATTERY, VIOLATIONS OF CALIFORNIA CIVIL CODE §52, AND DIRECT AND *RESPONDEAT SUPERIOR* LIABILITY OF SACRAMENTO COUNTY <br><br> JURY TRIAL DEMANDED |

## I.
## INTRODUCTION

This is a civil rights action arising out of the use of unnecessary and excessive force in the arrest of Plaintiff resulting from a failure to reasonably warn Plaintiff of a K-9 search, the improper execution of the K-9 search, the failure to properly train the K-9, and the failure to properly command and control the K-9 during the search.

## II.
## JURISDICTION AND VENUE

1.      Jurisdiction over the federal causes of action under Title 42 U.S.C. §1983 are proper in this Court under 28 U.S.C. §1331.  Pendant Jurisdiction over the state causes of action is proper under Title 28 U.S.C. §1367(a) and Title 28 U.S.C. §1343(a)(3).

2.      Venue is proper in this Court under 28 U.S.C. §1391(b) because all of the defendants reside, and the acts complained of occurred, within the territorial boundaries of this United States District Court.

3.      Intra-district venue is proper in the Sacramento Division of this Court under Local Rule 120(d) because the acts and omissions that are the basis of this complaint occurred within Sacramento County.

## III.
## PARTIES

4.      Plaintiff Ernest Lovett is a single male, age 40.  Plaintiff Lovett resided in Le Grand, Merced County, California at the time of the incident described below and he currently resides in San Francisco, California.

5.      Defendant Sacramento County, California, established and operates the Sacramento County Sheriff's Department ("SCSD") which is responsible for the staffing, training, and operation of a K-9 unit.

6.      Defendant Deputy Austin Schraeder ("Deputy Shraeder ") was employed by the SCSD and was working as a K-9 handler at the time of the events alleged below.

7.    Defendant Officers Does 1-5 were employed by the SCSD and were working as supervisory officers with responsibility for training and supervision of the use of K-9 teams, conducting investigations of alleged excessive use of force by K-9 teams, and enforcing existing SCSD policies regarding the use of K-9 teams.  Does 1-5 include the canine Sergeant, the Metro Special Operations Section Lieutenant, the Deputy Chief of Office of Specialized Services, the head of the Professional Standards Unit, the Undersheriff, and the Sheriff.

## IV.
## FACTUAL ALLEGATIONS

8.    On or about January 7, 2025, at approximately 3:45 pm, Plaintiff and his girlfriend were sitting in his vehicle in American River Park. SDSC park rangers Moore and Fuentes were in the American River Park and they observed that Plaintiff's vehicle did not have a front license plate, so they ran a records check on the vehicle and then on Plaintiff.  Park rangers Moore and Fuentes learned that Plaintiff had outstanding warrants and they approached Plaintiff as he existed his vehicle. Park rangers Moore and Fuentes asked Plaintiff for his driver's license and confirmed that he was the subject of the outstanding warrants.  Park rangers Moore and Fuentes told Plaintiff he was detained, however, Plaintiff began stepping backwards away from Park rangers Moore and Fuentes and then turned and ran towards the river.  Park rangers Moore and Fuentes followed Plaintiff and observed Plaintiff going upstream and into heavy brush.  Park rangers Moore and Fuentes lost direct visual, but kept up a line-of-sight observation.  Park rangers Moore and

3

Fuentes called for backup and additional SCSD deputies, a K-9 team, and SCSD Air 1 helicopter were sent to the scene.

9.     The SCSD K-9 team led by Defendant Deputy Schraeder arrived at about 4:05 pm and was directed to the last know position of Plaintiff.  Deputy Schraeder then made a K-9 search announcement in the direction of Plaintiff's last known position and stated that Plaintiff was under arrest.  Plaintiff was then observed going into the river and swimming towards the North (opposite) shore of the American River.

10.     The SCSD deputies and its Air 1 unit observed Plaintiff swimming to the bank of the American River towards 1870 Claremont Drive.  Park Ranger Fuentes continued to observe Plaintiff and updated SCSD deputies of his position by radio. Park Ranger Fuentes then observed Plaintiff climb the river embankment of the residence at 1864 Jeffrey Lane and then enter the backyard.

11.     When Plaintiff got to the other bank of the American River, he was exhausted and cold from swimming across the American river (on a Winter's day). Plaintiff made his way up the embankment and into the back yard of a house. Plaintiff struggled to breath and he collapsed on the ground in some bushes in the West side of the residence back yard. Plaintiff, exhausted fell unconscious and laid on the ground.  Plaintiff never heard an announcement for a K-9 search and, being unconscious, he was unaware of the continuing search effort by the SCSD.

12.     Meanwhile K-9 team handler Deputy Schraeder drove to 1864 Jeffrey Lane and at 4:32 Deputy Shraeder, standing in the front (street) side of the house at this

4

address, made a verbal (electronically unassisted) K-9 search announcement. Deputy Schraeder then organized and directed the various SCSD deputies and park rangers for the search. The canine was sent on an area search with the command "find". The search team was split into three units, one unit of two deputies/rangers on the far sides and then the K-9 handler closely followed by a group of 5 deputies/rangers.

13. The K-9 search proceeded around to the side and then into the large back yard of the house, checking the hot tub area, decks, and then down and across the large backyard, and then down and across the lengthy portion of the property along the river bank. On multiple occasions, Defendant Deputy Schraeder repeated the command "find" to the canine. Not receiving any canine alerts, the K-9 team moved back up into the backyard. Despite the large size of the property, various potential hiding places, varying terrain, and length of time, Defendant Deputy Schraider never gave a further K-9 search announcement to Plaintiff. This part of the search continue for about 11 minutes.

14. As the canine approached the vicinity where Plaintiff was laying unconscious, the canine did not alert its handler, Defendant Deputy Schraeder. The canine went past Plaintiff, then circled back, then quickly turned to its right and jumped into the brush where Plaintiff was located, immediately biting Plaintiff. The canine never gave an "alert" (e.g., barking), but instead, went to immediate to an "apprehension" without any command from Defendant Deputy Schraeder.

15. Plaintiff was awakened by a canine ferociously biting his left forearm.

5

Plaintiff, too exhausted to resist or move, began screaming "I'm not fighting", crying out in pain and begging anyone to make the dog stop.  Plaintiff lost consciousness again.  Plaintiff does not remember the SCSD deputies being able to stop the canine.

16.     Defendant Deputy Schraeder never gave a verbal command for the dog to release its hold on Plaintiff.  The canine continued to tear into Plaintiff's left forearm for approximately 20 seconds. Defendant Deputy Schraeder made no effort to recall the canine and waited to go in and do a "manual release".  Defendant Deputy Schraeder finally went in and pulled the canine up and away Plaintiff.

17.     Once Defendant Deputy Schraeder removed the canine, other SCSD deputies moved in and handcuffed Plaintiff.  It was immediately apparent that Plaintiff was bleeding profusely from his left forearm.  The SCSD deputies and rangers then applied a tourniquet on Plaintiff's left arm. Plaintiff was placed on a stretcher and taken to Mercy San Juan Medical Center.  Plaintiff underwent immediate surgery. Plaintiff was later informed by medical staff at Mercy San Juan Medical Center that he would have died quickly if the tourniquet had not been promptly applied.

18.     Plaintiff suffered serious disfigurement and permanent disability to his left arm.  To date, Plaintiff has been unable to return to work in his career as a professional electrician.

19.     Plaintiff is informed and believes, and on that basis alleges that Defendant Schraeder filed an incomplete and/or untruthful incident report about the adherence to the K-9 PPPs (defined in paragraph 22, below) and avoid being held

responsible for the use of excessive force against Plaintiff.

20. Plaintiff is informed and believes, and on that basis alleges that Defendant Schraeder has not retrained his canine to be in compliance with the K-9 PPPs so as to avoid the use of excessive force against suspects/arrestees.

21. Plaintiff is informed and believes, and on that basis alleges that Defendants Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) failed to (a) properly review and investigate the K-9 incident report prepared by Defendant Schraeder about the use of his canine to apprehend Plaintiff; and/or (b) failed to discipline Defendant Schraeder for his failure to adhere to the K-9 PPPs; and (c) failed to require Defendant Schraeder to retrain his canine in the K-9 PPPs so that future deployments of K-9 teams, including that of Defendant Schraeder, would be in compliance with the K-9 PPPs.

### Duties of Sacramento County and the SCSD to Have Appropriate Policies, Practices, and Procedures for K-9 Search and Apprehension

22. Defendant Sacramento County and the SCSD are obligated to have policies, practices, and procedures to prevent the unlawful use of force by K-9 teams against suspects and arrestees. Plaintiff is informed and believes, and on that basis alleges, that Exhibit 1 hereto is a true and correct copy of the SCSD General Order on the Use of Force ("General Order"), that Exhibit 2 hereto is a true and correct copy of the SCSD policy on the Use of Canines ("K-9 Order"), and that Exhibit 3 hereto is a true and correct copy of the SCSD K-9 SOP("K-9 SOP"). Taken together,

7

these documents (as they existed on January 7, 2025), comprised the core of relevant SCSD policies, practices, and procedures (the "K-9 PPPs") in effect at the time of the above alleged K-9 attack on Plaintiff.

23.    Plaintiff is informed and believes, and on that basis alleges, the K-9 Order PPPs are based upon the California Peace Officers Standards and Training ("POST") K-9 Guidelines, a true and correct copy of which is attached as Exhibit 4 hereto.  In this regard, the K-9 PPPs require that prior to assignment to the field, each canine team shall be trained and certified to meet POST standards and, *inter alia*, demonstrate an understanding and ability to use the handler control methodology, including the ability to control the canine both physically and *with verbal commands.*

24.    The SCSD K-9 PPPs require that K-9 handlers, such as Defendant Deputy Schraeder, shall use only that force which is reasonable, given the facts and circumstances perceived by the officer at the time of the event, to effectively bring an incident under control" and "the application of force shall cease when control of a prisoner or situation is achieved and shall not be used as a form of punishment."

25.    According to the K-9 PPPs, it is SCSD policy that "canine handlers meet and maintain the appropriate proficiency to effectively and reasonably carry out legitimate law enforcement objectives pursuant to ... [ the General Order]".  Further, according to the K-9 PPPs, it is SCSD policy that the "use of canines is to safely locate suspect(s) in areas that are difficult or dangerous to search, while preserving the handler's option to use minimal force or avoid force altogether, to

8

apprehend and place the suspect into custody."

26.     According to the K-9 PPPs, it is SCSD policy that "the canine is used to search and locate a suspect(s).  Should the suspect(s) surrender the canine will be called back by the handler.  Should the suspect resist or continue to evade officers, the canine will engage the suspect and be called off as soon as safely possible by the handler."

27.     According to POST K-9 Guidelines, when doing a search, the canine will locate a suspect and then "alert" the handler upon finding the suspect.  On command, the canine will then pursue and apprehend the suspect.  The canine will be able to be called off a search at any time by handler verbal command.  The canine will be able to be called off of an apprehension upon verbal command.  The canine shall remain under control while a handler attempts to gain compliance from the suspect.

28.     According to POST K-9 Guidelines, when a K-9 team is performing an area search: (1) the canine must demonstrate that it is trained to recall back to the handler with a verbal command (a "call-off"); and (2) the canine must demonstrate that it is trained to release a suspect upon verbal command.  In addition, a K-9 team must demonstrate the ability of the handler to physically remove the canine from a suspect in a reasonable amount of time (a "tactical" release).

29.     According to the K-9 PPPs, it is SCSD policy that: Canine Officers shall "[p]rovide verbal warnings in a loud voice or by amplified sound prior to releasing the canine" and "after a reasonable period of compliance, repeat the warning."

Further, according to the SCSD K-9 Order, it is SCSD policy that the canine handler "[r]epeat additional warnings when appropriate and safe to do so or when encountering structures where initial canine warnings may not have been heard."

30. According to the K-9 PPPs, it is SCSD policy that:

"[w]hen a canine has engaged a suspect, the handler shall direct the canine to release its hold as quickly as possible when the totality of the circumstances indicates the suspect is surrendering or when adequate resources are available to take the suspect into custody. Factors in assessing when a suspect is surrendering include, but are not limited to:

  a. Suspect verbally surrenders
  b. Suspects hands can be seen and are not in possession of a weapon
  c. Suspect physically complies (e.g., hands in the air, follows verbal commands, or body language indicative of surrendering.

31. According to the K-9 PPPs, it is SCSD policy that k-9 handlers "[r]epeat additional warnings when appropriate and safe to do so or when encountering structures where initial canine warnings may not have been heard." Further, "[w]hen feasible for area searches, verify the announcement could be heard by another officer on the perimeter opposite the warning."

32. According to the K-9 PPPs, it is SCSD policy that in the case of an unintentional or inappropriate bite, the canine handler shall, *inter alia,* notify the watch commander and canine sergeant of the incident, obtain a statement from the injured person and witnesses, obtain photos of the suspect's injuries, complete appropriate reports and memoranda detailing the incident, and complete a "red border form".

33. According to the K-9 PPPs, it is SCSD policy that in the case of an

10

unintentional or inappropriate bite, the "canine Sergeant shall be notified as soon as possible of any unintentional apprehension" and, *inter alia*, review all of the pertinent video, notify the Metro Special Operations Section Lieutenant, coordinate with the Professional Standards Unit, identify any training lessons to be learned from the incident and address these with the canine handler and canine unit, identify any policy violations, prepare a report and a "red border form", and document findings in a memorandum to the Deputy Chief of Office of Specialized Services.

### Failure to Monitor and Enforce the K-9 PPPs

34.     As alleged in paragraph 32, SCSD K-9 teams are obligated to prepare timely, complete, and truthful incident reports about the deployment of canines that result in the use of force against suspects/arrestees so that each such canine incident can be evaluated for adherence to the K-9 PPPs and the use of excessive force.  Plaintiff is informed and believes, and on that basis alleges, that K-9 team deputies often filed incomplete and/or untruthful incident reports about their use of force to avoid being held responsible.

35.     Plaintiff is informed and believes that supervisory officers at the time of the attack on Plaintiff, identified as Does 1-5 (i.e., the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) were aware of the incomplete and/or untruthful officer incident reports about the use of excessive force by K-9 teams, but they failed to take any corrective measures, such as retraining canines and/or appropriate

11

disciplinary actions against the offending deputy K-9 handlers. As a direct consequence of this failure,  K-9 team handlers, including Defendant Schraeder, did not take the K-9 PPPs seriously and SCSD K-9 handlers were more likely too use excessive force on detainees and arrestees.  As a direct consequence, these failures led to the use of excessive force against Plaintiff and other suspects and arrestees.

### Prior Instances of the Use of Excessive Force
### Against Detainees/Arrestees by K-9 Teams

36.     Defendant Sacramento County and the SCSD have been repeatedly informed during the ten years prior to the incident alleged in this Complaint about instances of inappropriate and excessive force by its K-9 teams.  These include, but are not limited to the following eleven serious violations of the K-9 PPPs in the ten years prior to the attack upon Plaintiff:

A.      On March 9, 2009, Anthony Jones was subject to excessive force when Defendants County of Sacramento, SCSD K-9 team deployed a canine. Jones attempted to flee from deputies on foot when he was shot with pellets, tackled to the ground, beaten, and handcuffed.  SCSD K-9 team then deployed a canine against Jones and the canine was permitted to maul Jones for approximately 45-to-50 seconds. Jones sustained disfigurement to his left calf. Jones filed a civil rights lawsuit. (*Jones v. McAtee*, United States District Court, Eastern District of California, Case No. 2:10-cv-00033-MCE-CMK.) The case was settled.

B.      On April 15, 2020, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine

12

against an arrestee. The arrestee fled from a vehicle reported to have been stolen. After pursuit by SCSD deputies, the arrestee stole and crashed a golf cart into the side of a building. SCSD K-9 handler deployed a canine against the arrestee. The canine bit the arrestee's upper left arm and pulled him off the golf cart. The SCSD K-9 handler grabbed the arrestee and slammed him face-first into the concrete-paved ground while allowing the canine to continue mauling the arrestee as he lay on the ground. The SCSD K-9 handler punched the arrestee in the face three times while the canine was attacking the arrestee. The SCSD K-9 handler only removed the canine from mauling the arrestee after additional SCSD deputies arrived on-scene. The arrestee sustained four punctures on the outside of his left bicep, approximately five lacerations around these punctures, and approximately three lacerations on the inside of his left bicep. (SCSD Case No. 20-123726)

C. On July 12, 2020, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine against an arrestee. The arrestee was inside of a locked bathroom on school grounds and an alarm had been activated. The SCSD K-9 handler kicked open the locked backroom door. The arrestee was sitting on a toilet wearing only boxer shorts, and had been sleeping before the door was kicked open. The SCSD K-9 handler Deputy deployed a canine against the arrestee. The canine bit the arrestee's left forearm and dragged the arrestee off the toilet and out of the bathroom. The arrestee complied with orders to lie down on the ground and was handcuffed, before the canine was released from biting the arrestee. The arrestee sustained numerous

punctures marks on the left forearm, including on the top and bottom sides of the forearms, which were still bleeding after the arrest. X-rays revealed that the arrestee sustained small fractures to his wrist, for which surgery was recommended. (SCSD Case No. 20-223981)

D.    On October 30, 2020, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine. The arrestee fled on foot into a field from a vehicle which had been pursued by SCSD deputies. The arrestee was located lying face down in the field in a prone position about 20 yards away. The SCSD K-9 handler deployed a canine into the area. The arrestee was bitten on his head by the canine. The SCSD K-9 handler ordered the canine to release the arrestee's head, but then re-deployed the canine against the arrestee. The canine mauled the arrestee's left hand. The arrestee was handcuffed. The arrestee sustained a large laceration to his head and puncture and drag marks to his right arm and left hand/wrist. SCSD Case No. 20-344195.

E.    On November 10, 2020, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine against am arrestee who fled on foot from the scene of a vehicle accident. The SCSD located the arrestee in the backyard of a residence, hiding under a picnic table. The SCSD K-9 team released a canine into the backyard. The arrestee was mauled on his left thigh by Cash. The SCSD K-9 team permitted the canine to continue mauling the arrestee until handcuffs were applied. The arrestee sustained several puncture marks, lacerations, and drag marks to his left thigh and his right

and left hands. SCSD  Case No. 20-356898)

F.       On January 31, 2021, an arrestee was subject to excessive force when Defendants Sacramento County and the SCSD deployed a canine. The arrestee was suspected of burglary and, when contacted by deputies, fled into his wife's residence. A SCSD K-9 team gained access to the residence and deployed a canine into the residence.  The canine was showing interest in a bedroom closet with attic access. The canine was then directed into a makeshift hold leading into the attic without warning to the arrestee. The canine found and bit the arrestee in the attic. The K-9 team decided to leave canine biting the arrestee while he ordered the arrestee to crawl towards the K- handler. The arrestee and canine then fell through the ceiling as the arrestee attempted to crawl towards the K-9 team. Vasquez while being bitten by Rooney. The arrestee was detained after he fell through the ceiling. The arrestee sustained multiple abrasions and a sizable laceration in his left armpit. SCSD Case No. 2021-29991)

G.       On February 18, 2021, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD deployed a canine. The arrestee was suspected of vehicle theft and fled on foot. A SCSD K-9 team deployed a canine against the fleeing subject.  The canine bit the subject on the right arm below the elbow, causing the arrestee to fall to the ground.  The K-9 then continued the attack by biting the arrestee's left arm. The arrestee pleaded for the SCSD K-9 team to recall the dog, but the SCSD K-9 team refused to release the canine from the arrestee.  The SCSD K-9 team continued to allow the canine to bite the arrestee

while SCSD deputies utilized an arm bar control hold on the arrestee until more SCSD deputies arrived. After the K-9 team recalled the canine, the arresting SCSD deputy kicked the arrestee with his boot striking him in the "shoulder area" and "left eyebrow area." The arrestee sustained injuries, including a laceration on his left arm, multiple canine tooth punctures wounds on both of the arrestee's arms. SCSD Case No. 2021-50607.)

H.      On April 2, 2021, an arrestee was subject to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine. The arrestee briefly fled from SCSD deputies on a motorcycle because he feared the SCSD deputies were attempting to run-over him with their patrol vehicles. The arrestee lost control of the motorcycle, which was crashed down an embankment. The arrestee was apprehended when an SCSD deputy deployed a taser against the subject, causing him to fall to the ground. At the same time as the taser was deployed, the SCSD K-9 team also deployed canine against the arrestee. The canine mauled the arrestee's left forearm. The canine was visibly affected by the current of the Taser which was still deployed when the canine attacked the arrestee. The arrestee sustained punctures and lacerations on both sides of his left wrist. (SCSD Case No. 2021-96740)

I.      On September 17, 2022, Defendants Sacramento County and the SCSD K-9 team encountered plaintiff Garcia riding a bicycle. The SCSD K-9 team observed that Garcia was unarmed. The SCSD K-9 team gave a warning that the canine would be deployed against Garcia. Garcia stopped and turned his bicycle to

16

face the SCSD K-9 team and said Okay, he was stopped. The SCSD K-9 team then released the canine towards Garcia and the SCSD deputy and the canine raced towards Garcia. Garcia continued to say out loud that he surrendered. Nonetheless, the SCSD K-9 handler commanded the canine to bite Garcia. Garcia slipped on wet grass and fell to the ground and was then attacked by the canine. The SCSD deputy allowed the canine's continued attack on Garcia even though Garcia was unarmed, not resisting, and made no threats. While the canine continued to attack, the SCSD K-9 handler demanded that Garcia put his hands behind his back even though Garcia was unable to do that because of the continuing dog attack. The SCSD K-9 handler then demanded that Garcia roll onto his stomach while the canine continued to attack. The SCSD K-9 handler put a cuff on one of Garcia's hands and then demanded that Garcia put his other hand behind his back even though the canine was continuing to attack Garcia's free arm. After about a minute, the SCSD deputy got Garcia's other hand in the cuffs, but he let the canine continue to attack Garcia. The SCSD k-9 handler then called for the canine to stop, but the canine did not stop. Finally, the SCSD K-9 handler grabbed the dog and tried to pull the canine off of Garcia, but failed. Another SCSD deputy arrived and assisted the K-9 handler with choking the canine to make it let go. Finally, the canine was pulled off Garcia. Garcia was bleeding profusely, but the SCSD deputies refused to put a tourniquet on the bleeding arm. Another SCSD deputy arrived and placed a tourniquet on Garcia's arm. Garcia was taken to a hospital and underwent surgery to repair his arm. However, Garcia's arm was permanently

17

disfigured and disabled. Garcia brooght an action in the Federal District Court, Eastern District of California, Case No. 2:23-cv-00899-DAD-CSK.   The case was settled.

J.      On January 8, 2023, Manuel Bencomo was subjected to excessive force when Defendants County of Sacramento and the SCSD K-9 team deployed a canine. SCSD K-9 team deputies entered Bencomo's residence while he was asleep inside of his bedroom. The SCSD K-9 team opened the bedroom door and released a canine on Bencomo.   Bencomo was badly mauled by the canine, including suffering a serious bite wounds to his upper-arm. Bencomo required several stitches to close the bite wounds on his arm. The Sacramento County District Attorney's Office declined to prosecute Bencomo for any crime. Bencomo filed a civil rights lawsuit. (*Bencomo v. County of Sacramento,* Case No. 2:23-cv-00440-DAD-JDP) The case was settled.

K.      On January 19, 2023, Alexio Perez was subjected to excessive force when Defendants County of Sacramento and a SCSD K-9 team  deployed a canine against plaintiff.  The plaintiff was driving a motorcycle when a SCSD vehicle signaled Perez to pull-over. Perez dismounted the motorcycle, attempted to hide, and then, when he saw the SCSD K-9 team had spotted him and released their canine, Perez got onto his knees with his hands in the air and surrendered. However, the SCSD K-9 team failed to recall the canine which bit Perez's left arm and hand and severed his left ring finger from his hand. Perez pleaded with the SCSD K-9 team to call-off the canine, but the SCSD K-9 team failed to timely do

18

this.  As a result of the unnecessary deployment and the failure to timely recall the canine, Perez was seriously injured and permanently disfigured.

## V.
## EXHAUSTION

37.     On or about June 20, 2024, Plaintiff filed a claim against the County of Sacramento concerning the allegations in this action.

38.     Plaintiff's claim was rejected by the County of Sacramento on or about August 4, 2025, as a matter of law pursuant to Cal. Gov. Code § 912.4(c).

## VI.
## FEDERAL CLAIMS

### FIRST CAUSE OF ACTION

### Defendant SCSD Deputy Austin Schraeder

### Individual Liability for Violation of Plaintiff's
### Constitutional Rights Under 42 U.S.C. §1983
### (Excessive Use of Force )

39.    Plaintiff hereby incorporates by reference paragraphs 1 through 38, inclusive, as though set forth fully herein.

40.    Defendant Deputy Schraeder, acting under the color of state law, committed the acts and omissions as alleged in paragraphs 8-21 that caused the use of excessive force upon Plaintiff.   These wrongful acts and omissions included:

    A.    The failure to provide adequate verbal warnings as appropriate to warn Plaintiff of the K-9 search;

    B.    The failure to have the canine "alert" (e.g., bark) when it found Plaintiff;

    C.    The failure to  issue a command to apprehend Plaintiff only after the canine gave an "alert";

    D.    The failure to timely release the canine from its apprehension of Plaintiff by verbal command;

    E.    The failure to timely release the canine from its apprehension of Plaintiff by a manual release;

    F.    The failure to train the canine in accordance with the POST K-9

20

Guidelines and the SCSD K-9 Order.

41.    The wrongful acts and omissions of Deputy Schraeder were the direct and proximate causes of, or were there moving force behind, the violation of Plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment (as incorporated through the Fourteenth Amendment) to the U.S. Constitution.

42.    The foregoing wrongful acts and omissions of Defendant Deputy Schraeder were done under the color of state law.

43.    As the result of the foregoing wrongful conduct of Defendant Deputy Schraeder, Plaintiff is entitled to recover general, consequential, and special damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

44.    The foregoing wrongful acts and omissions of Defendant Deputy Schraeder , were committed with malice toward, and callous disregard of, Plaintiff that was despicable. As a result, punitive damages should be awarded against this Defendant.

21

45.    As a direct and proximate result of the foregoing conduct of Defendant Deputy Schraeder,  Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorney's fees and costs under 42 U.S.C. §1988.

## SECOND CAUSE OF ACTION

### Defendant Sacramento County, operator of the SCSD
### Municipal Liability for Violation of Plaintiff's Constitutional Rights

### (Deliberate and Callous Disregard for Repeated Acts of Excessive Force)

46.    Plaintiff hereby incorporates by reference paragraphs 1-38, inclusive, as though set forth fully herein.

### Failure to Train

47.    Defendant Sacramento County, the operator of the SCSD, failed to adequately train its K-9 teams in the K-9 PPPs to prevent the use of excessive force against suspects.  In particular, there has been a SCSD failure to train K-9 Team handlers to:

    A.    only use canine force which is reasonable, given the facts and circumstances, to bring a suspect under control and then to cease the application of canine force when control of a suspect is achieved to minimize the use of force in the apprehension of suspects;

    B.    provide adequate warning of the K-9 search, including making additional warnings when appropriate;

    C.    alert on a search suspect before apprehending the suspect (e.g., to bark before bite);

D.   verbally direct the canine to release its hold as quickly as possible when circumstances indicate that the suspect is surrendering and/or there are adequate resources on scene to take the suspect into custody; and

E.   manually release the canine as quickly as possible when circumstances indicate that the suspect is surrendering and/or there are adequate resources on scene to take the suspect into custody

### Failure to Supervise

48.   Defendant Sacramento County and its SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) have failed to adequately monitor SCSD  K-9 teams for compliance with the K-9 PPPs or to enforce the K-9 PPPs with appropriate discipline and retraining of canines to prevent the use of excessive force against suspects/arresstees.  In particular, there has been a failure to:

A.   Ensure that K-9 teams are preparing complete and accurate reports of K-9 incidents that result in the inappropriate bite of a suspect/arrestee so that each canine incident can be evaluated for adherence to the K-9 PPPs and whether the use of force was excessive.

B.   Enforce the K-9 PPPs by disciplining K-9 handlers that have not complied therewith and/or requiring additional training of K-9 Teams to ensure full compliance in the future.

23

49. It was known and/or obvious to Defendants Sacramento County and the SCSD supervisory staff Does 1-5 that the acts and omissions described in paragraphs 8-21 and 34-36 would be likely to cause serious violation of the constitutional rights of suspects/arrestees.

50. The foregoing acts and omissions were done under the color of state law and they were the direct and proximate cause of the violation of the constitutional rights of Plaintiff as alleged in paragraphs 8-21. These acts and omissions continued for at least a year prior to the institution of this action and Plaintiff is informed and believes, and on that basis alleges, that these acts and omissions continue until the present time. As a consequence of the continuing nature of the foregoing acts and omissions of Defendant Sacramento County and the SCSD, Defendant Sacramento County has been deliberately indifferent to, and acted with a callous disregard for, the constitutional rights of suspects/arrestees.

51. As a direct and proximate result of the foregoing wrongful acts and omissions of Defendant Sacramento County and the SCSD, Plaintiff has sustained general, consequential, and special damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security,

24

dignity, and pride.

52.   As a direct and proximate result of the foregoing conduct of Defendant Sacramento County, Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorney's fees and costs under 42 U.S.C. §1988.

**THIRD CAUSE OF ACTION**

**Defendant SCSD Officers Does 1-5**

**Individual Liability for Violation of Plaintiff's
Constitutional Rights Under 42 U.S.C. §1983**

**(Failure to Fulfill Supervisory Duties Regarding the Use of Force)**

53.   Plaintiff hereby incorporates by reference paragraphs 1-38, inclusive, as though set forth fully herein.

54.   Defendants SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) have failed to adequately monitor SCSD K-9 teams for compliance with the K-9 PPPs or to enforce the K-9 PPPs with appropriate discipline and retraining of canines to prevent the use of excessive force against suspects/arresstees.  In particular, there has been a failure to:

A.   Ensure that K-9 teams are preparing complete and accurate reports of K-9 incidents that result in the bite of a suspect/arrestee so that each canine incident can be evaluated for adherence to the K-9 PPPs and whether the use of force was excessive;

B.   Enforce the K-9 PPPs by disciplining K-9 handlers that have not

25

complied with the K-9 PPPs resulting in the use of excessive force; and

C.  require additional training of K-9 Teams to ensure future compliance with the K-9 PPPs.

55.  It was known and/or obvious to Defendant SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) that the foregoing acts and omissions were done under the color of state law and would be likely to cause the excessive use of force by inferior offices that result in serious violation of the constitutional rights of persons in custody.

56.  As a direct and proximate result of the foregoing wrongful acts and omissions of Defendant SCSD supervisory staff Does 1-5, Plaintiff has sustained general, consequential, and special damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

57.  The foregoing wrongful acts and omissions of Defendant SCSD supervisory staff Does 1-5 were committed with malice toward, and callous disregard of, Plaintiff that was despicable. As a result, punitive damages should be awarded

26

against these Defendants.

58.    As a direct and proximate result of the foregoing conduct of Defendant SCSD supervisory staff Does 1-5 , Plaintiff has been forced to file this action under 42 U.S.C. §1983, and is entitled to recover his attorney's fees and costs under 42 U.S.C. §1988.

27

## VII
## STATE CLAIMS

### FOURTH CAUSE OF ACTION

### Defendant Deputy Schraeder

### Bane Act (Cal. Civ. Code § 52.1)

59.    The allegations of the preceding paragraphs 1 to 38 are re-alleged and incorporated herein, to the extent relevant, as if fully set forth in this claim.

60.    Defendant Deputy Schrader, acting or purporting to act in the performance of his official duties as a law enforcement officer, used threats, intimidation, coercion, and unnecessary and excessive force against Plaintiff as described in paragraphs 8-21 to interfere with Plaintiff's exercise and enjoyment of the rights secured by both the U.S. Constitution and the California Constitution.

61.    As the result of the foregoing wrongful conduct of Defendant Deputy Schraeder, Plaintiff is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

62.    Pursuant to California Civil Code §52(a) and §52.1(b), Plaintiff is entitled to

28

treble the amount of general, consequential, and special damages that are proven. In addition, Plaintiff is entitled to recover his costs and attorney's fees under Civil Code § 52(b) and § 52.1(h).

63.    The foregoing wrongful acts and omissions of Defendant Deputy Schraeder were committed with malice toward, and callous disregard of, Plaintiff that was despicable.   As a result, punitive damages should be awarded against these Defendants.

**FIFTH CAUSE OF ACTION**

**Defendants SCSD Officers Does 1-5**

**Bane Act (Cal. Civ. Code § 52.1)**

64.    The allegations of the preceding paragraphs 1 to 38 are re-alleged and incorporated herein, to the extent relevant, as if fully set forth in this claim.

65.    Defendants SCSD Officers Does 1-5, acting or purporting to act in the performance of their official duties as a law enforcement officers, allowed threats, intimidation, coercion, and unnecessary and excessive force against Plaintiff as described in paragraphs 8-21, 34-36, and 54 to interfere with Plaintiff's exercise and enjoyment of the rights secured by both the U.S. Constitution and the California Constitution.

66.    As the result of the foregoing wrongful conduct of Defendants SCSD Officers Does 1-5, Plaintiff is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a)

physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

67.     Pursuant to California Civil Code §52(a) and §52.1(b), Plaintiff is entitled to treble the amount of general, consequential, and special damages that are proven. In addition, Plaintiff is entitled to recover his costs and attorney's fees under Civil Code § 52(b) and § 52.1(h).

68.     The foregoing wrongful acts and omissions of Defendants SCSD Officers Does 1-5 were committed with malice toward, and callous disregard of, Plaintiff that was despicable.   As a result, punitive damages should be awarded against these Defendants.

SIXTH CAUSE OF ACTION

Defendant Deputy Schraeder

ASSAULT

69.     The allegations of the preceding paragraphs 1 to 38 are re-alleged and incorporated herein, to the extent relevant, as if fully set forth in this claim.

70.     Plaintiff alleges that Defendant Deputy Schraeder, acting as a team with his K-9 partner, without the consent of Plaintiff and acting with the intent to cause harmful contact upon him, did threaten to touch Plaintiff in a harmful and offensive

30

manner.

71.    Plaintiff reasonably believed that Defendant Deputy Schraeder, acting as a team with his K-9 partner,  was capable and poised to carry out the threat to physically harm Plaintiff.

72.    As the direct result of Defendant Deputy Schraeder's K-9 team assault upon Plaintiff, Plaintiff has been harmed and is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

73.    The foregoing wrongful acts and omissions of Defendant Deputy Schraeder were committed with malice toward, and callous disregard of, Plaintiff that was despicable.  As a result, punitive damages should be awarded against these Defendants.

## SEVENTH CAUSE OF ACTION

### Defendant Deputy Schraeder

### BATTERY

74.    Plaintiff hereby incorporates by reference paragraphs 1 through 38, inclusive, as though set forth fully herein.

75.    Plaintiff alleges that Defendant Deputy Schraeder, acting as a team with his K-9 partner, without the consent of Plaintiff and acting with the intent to cause harmful contact upon Plaintiff, did touch Plaintiff in a harmful and offensive manner.

76.    Plaintiff was physically and psychologically harmed by the conduct of Defendant Deputy Schraeder, acting as a team with his K-9 partner.

77.    A reasonable person in Plaintiff's situation would have been offended and harmed by the touching of Defendant Deputy Schraeder's K-9 team.

78.    As the direct result of the battery of Plaintiff by Defendant Deputy Schraeder, Plaintiff has been harmed and is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and

pride.

79.   The foregoing wrongful acts and omissions of Defendant Deputy Schraeder were committed with malice that was despicable and done with callous disregard for Plaintiff. As a result, punitive damages should be awarded against these Defendants.

**EIGHTH CAUSE OF ACTION**

**Defendant Deputy Schraeder**

**Negligence**

80.   The allegations of the preceding paragraphs 1 to 38 are re-alleged and incorporated herein, to the extent relevant, as if fully set forth in this claim.

81.   Defendant Deputy Schraeder, acting or purporting to act in the performance of his official duties as a law enforcement officer, owed Plaintiff a duty of care and he breached that duty by the wrongful acts and omissions alleged in paragraphs 8-21.

82.   As the result of the foregoing wrongful conduct of Defendant Deputy Schraeder, Plaintiff is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety,

humiliation, and the loss of a sense of security, dignity, and pride.

83. The foregoing wrongful acts and omissions of Defendant Deputy Schraeder were committed with malice toward, and callous disregard of, Plaintiff that was despicable. As a result, punitive damages should be awarded against these Defendants.

## NINTH CAUSE OF ACTION

### Defendants SCSD Officers Does 1-5

### Negligence

84. The allegations of the preceding paragraphs 1 to 38 are re-alleged and incorporated herein, to the extent relevant, as if fully set forth in this claim.

85. Defendants SCSD Officers Does 1-5, acting or purporting to act in the performance of their official duties as a law enforcement officers, owed Plaintiff a duty of care and they breached that duty by the wrongful acts and omissions alleged in paragraphs 8-21, 34-36, and 54.

86. As the result of the foregoing wrongful conduct of Defendants SCSD Officers Does 1-5, Plaintiff is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the

34

resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

87.     The foregoing wrongful acts and omissions of Defendants SCSD Officers Does 1-5 were committed with malice toward, and callous disregard of, Plaintiff that was despicable.   As a result, punitive damages should be awarded against these Defendants.

## TENTH CAUSE OF ACTION

### Defendant Sacramento County

### *RESPONDEAT SUPERIOR* LIABILITY

88.     Plaintiff hereby incorporates by reference paragraphs 1 through 38, inclusive, as though set forth fully herein.

89.     Plaintiff was harmed by the wrongful conduct of Defendant Deputy Schraeder and SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) as alleged in paragraphs 8-21, 34-36, and 54 and the First and Third through Ninth Causes of Action.

90.     Plaintiff further alleges that Defendant Sacramento County is vicariously liable, through the principles of *respondeat superior* and pursuant to Cal. Gov. Code §§ 815.2(a), 815.6, 820(a), and Civil Code §52.1 for injuries proximately caused by the wrongful acts and omissions  of its employees acting within the scope of their employment, including the acts and omissions of Defendant Deputy Schraeder and SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations

35

Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) as alleged in paragraphs 8-35 and the First and Third through Sixth Causes of Action.

91.     As the direct result of the wrongful acts and omissions of Defendant Deputy Schraeder and  SCSD supervisory staff Does 1-5 (the canine Sergeant, Metro Special Operations Section Lieutenant, Deputy Chief of Office of Specialized Services, the Undersheriff, and the Sheriff) , Plaintiff has been harmed and is entitled to recover general and compensatory damages in excess of $1,500,000, according to proof, including, but not limited to the: (a) physical pain and suffering from the injuries to his body; (b) costs for medical care for his injuries; (c) loss of economic opportunity as a result of his physical disability and inability to work as an electrician and construction worker; and (d) severe emotional and mental distress caused by the use of excessive force and from the resulting physical injuries to his body, including feelings of helplessness, anxiety, humiliation, and the loss of a sense of security, dignity, and pride.

## PRAYER

**Wherefore**, Plaintiff prays for judgment against Defendants as follows:

1. For general, consequential, and special damages in the sum set forth in Counts 1-10, according to proof;

2. For punitive damages in a sum according to proof in Counts 1, 3-9;

3. For reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988 in Counts 1-3;

4. For reasonable attorney's fees and costs pursuant to California Civil Code §51 and §52 in Counts 4-5;

5. For treble damages (3x consequential) in Counts 4-5;

6. For cost of suit herein incurred for all counts; and

7. For such other and further relief as the Court deems just and proper.


Dated: January 16, 2026                    Respectfully,


                                           By: /s/ Patrick H. Dwyer
                                           Patrick H. Dwyer, counsel for
                                           Plaintiff Ernest Lovett

## JURY TRIAL DEMAND

A Jury Trial is demanded on behalf of Plaintiff Ernest Lovett.


Dated: January 16, 2026                          Respectfully Submitted,


                                                 By: /s/ Patrick H. Dwyer
                                                 Patrick H. Dwyer, counsel for
                                                 Plaintiff Ernest Lovett

# EXHIBIT 1

# SACRAMENTO POLICE DEPARTMENT
## GENERAL ORDERS




**580.02
USE OF FORCE
12-16-21**

## PURPOSE

This policy establishes guidelines for the use and application of force, as well as the procedures for after-force medical care.

## POLICY

The Sacramento Police Department (SPD) values the sanctity of human life and the freedoms guaranteed by the United States and California constitutions.  Use of force (UOF) by peace officers is of important concern to the community.  The role of law enforcement is to safeguard life, dignity, and liberty of all persons, without prejudice to anyone. Peace officers shall carry out duties, including UOF, in a manner that is fair and unbiased. This policy will be regularly reviewed and updated by the Professional Standards Division to reflect developing practices and procedures.

It is the policy of the Department that a peace officer is justified in using deadly force upon another person only as a last resort when reasonable alternatives have been exhausted or are not feasible and the officer reasonably believes, based on the totality of the circumstances, that such force is necessary.

This policy is based upon Assembly Bill 392 as codified in Penal Code 835a which states:

(a) The Legislature finds and declares all of the following:

(1) That the authority to use physical force, conferred on peace officers by this section, is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Legislature further finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law.

(2) As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

(3) That the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

(4) That the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.

(5) That individuals with physical, mental health, developmental, or intellectual disabilities are significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement.

 

Case 2:26-cv-00146-WBS-AC    Document 1    Filed 01/16/26    Page 41 of 90

(b) Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

(c) (1) Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:

(A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person.

(B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

(2) A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.

(d) A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this subdivision, "retreat" does not mean tactical repositioning or other de-escalation tactics.

(e) For purposes of this section, the following definitions shall apply:

(1) "Deadly force" means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

(2) A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(3) "Totality of the circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force.

## POLICY AND PROCEDURE

A. <u>DEFINITIONS AND CONCEPTS</u>
1. IMMINENT THREAT OF DEATH OR SERIOUS BODILY INJURY - A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.
2. FEASIBLE - Reasonably capable of being done or carried out under the totality of the circumstances to successfully achieve the lawful objective without increasing risk to the peace officer or another person.



3. TOTALITY OF THE CIRCUMSTANCES – All facts known to, or perceived by, the peace officer at the time, including the conduct of the officer and the subject leading up to the UOF.

4. PROPORTIONALITY - The balance of the severity of the offense committed, the threat to public safety and the level of force needed to overcome resistance based on the totality of the circumstances known to, or perceived by, the officer at the time.

5. DE-ESCALATION - Taking action or communicating verbally or nonverbally during a potential force encounter in an attempt to stabilize the situation and reduce the immediacy of the threat so that more time, options, and resources can be called upon to resolve the situation without the UOF or with a reduction of the force necessary.  De-escalation tactics include, but are not limited to, warnings, verbal persuasion, and tactical repositioning.

6. CRISIS INTERVENTION TECHNIQUES (CIT) - A collaborative approach to safely and effectively address the needs of people with mental illnesses, link them to appropriate services, and divert them from the criminal justice system if appropriate. The primary goal of CIT is to improve peace officer and mental health consumer safety while reducing injuries to peace officers and consumers during law enforcement contacts. Crisis intervention techniques include using distance, time, verbal tactics, or other tactics to de-escalate a situation.

7. REACTIVE AUTHORITY- Pre-determined set of force directives given during a critical incident, provided by the Incident Commander or designee, regarding the type of force authorized to effect an arrest, overcome resistance, prevent escape, and/or to preserve life. The reactive authority shall be consistent with current policy and law.

8. PERSONAL BODY WEAPON (PBW) - Improvised use of a part of a peace officer's body, including but not limited to the head, hands, arms, legs, and feet, as a weapon.

9. LEVELS OF RESISTANCE
   a. COMPLIANT - Subject offers no resistance.
   b. PASSIVE NON-COMPLIANCE – Subject does not respond to verbal commands but also offers no physical form of resistance.
   c. ACTIVE RESISTANCE – Subject uses evasive movements in an attempt to defeat a peace officer's attempt at control, including bracing, tensing, running away, verbally or physically signaling an intention to avoid or prevent being taken into or retained in custody.
   d. ASSAULTIVE – The subject is aggressive or combative; attempting to assault the peace officer or another person, verbally or physically displays an intention to assault the peace officer or another person.
   e. LIFE-THREATENING – The subject is taking action likely to result in serious bodily injury or death of the peace officer or another person.

10. FORCE DEFINITIONS
   a. REPORTABLE UOF - Any UOF that causes injury as defined below; any UOF whether or not it results in injury, involving the discharge of a firearm, a canine bite, or use of an impact weapon, chemical agent, or CED; and any UOF, whether or not it results in injury, that deviates from the techniques taught and the equipment provided by the department (section G.4. & G.5.).
   b. LESS LETHAL FORCE- Any force that is not reasonably likely to cause death.  Less lethal force options include, but are not limited to, the use of the CED, baton, chemical agents, 40mm projectiles, bean bag shotgun rounds, personal body weapons, and control holds.
   c. DEADLY FORCE - Any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

11. INJURY DEFINITIONS
   a. INJURY - Any visible bodily injury or complaint of bodily injury (non-visible injury) reasonably related to the UOF applied. This type of injury does not include the temporary pain associated with the proper application of control holds and/or restraints.




   b. SERIOUS BODILY INJURY- Bodily injury that involves a substantial risk of death, unconsciousness, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member or organ.

12. POSTITIONAL ASPHYXIA – Situating a person in a manner that compresses their airway and reduces the ability to sustain adequate breathing. This includes, without limitation, the use of any physical restraint that causes a person's respiratory airway to be compressed or impairs the person's breathing or respiratory capacity, including any action in which pressure or body weight is unreasonably applied against a restrained person's neck, torso, or back, or positioning a restrained person without reasonable monitoring for signs of asphyxia.

13. RETALIATION – Demotion, failure to promote to a higher position when warranted by merit, denial of access to training and professional development opportunities, denial of access to resources necessary for an officer to properly perform their duties, or intimidation, harassment, or the threat of injury while on duty of off duty.

14. INTERCEDE- For purposes of this policy, the term "intercede" includes, but is not limited to, physically stopping an excessive use of force, recording the excessive force, if equipped with a body-worn camera, and documenting efforts to intervene, efforts to deescalate the offending officer's excessive use of force, and confronting the offending officer about the excessive force during the use of force; and if the offending officer continues, reporting to dispatch or the watch commander on duty and stating the offending officer's name, unit, location, time, and situation, in order to establish a duty for that officer to intervene.

15. EXCESSIVE FORCE- A level of force that is found to have violated Section 835a of the Penal Code, the requirements on the use of force required by this section, or any other law or statute, including Section 835a of the Penal Code and Section 7286 of the Government Code.

16. KINETIC ENERGY PROJECTILES- For purposes of this policy, the term "kinetic energy projectiles" means any type of device designed as less lethal, to be launched from any device as a projectile that may cause bodily injury through the transfer of kinetic energy and blunt force trauma. For purposes of this section, the term includes, but is not limited to, items commonly referred to as rubber bullets, plastic bullets, beanbag rounds, and foam tipped plastic rounds.

17. CHEMICAL AGENTS- For purposes of this policy, the term "chemical agents" means any chemical that can rapidly produce sensory irritation or disabling physical effects in humans, which disappear within a short time following termination of exposure. For purposes of this section, the term includes, but is not limited to, chloroacetophenone tear gas, commonly known as CN tear gas; 2-chlorobenzalmalononitrile gas, commonly known as CS gas; and items commonly referred to as pepper balls, pepper spray, or oleoresin capsicum.

B. <u>DUTY TO INTERCEDE</u>

1. If a peace officer observes another officer using force that is clearly beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances, taking into account the possibility that other officers may have additional information regarding the threat posed by a subject, the peace officer shall intercede, when feasible to do so under the totality of the circumstances. If they do not do so, they shall be subject to discipline to the same severity as if they themselves engaged in the excessive force.

2. Peace officers shall immediately report potential excessive force to a superior officer when present and observing another officer using force that the officer believes to be beyond that which is necessary, as determined by an objectively reasonable officer under the circumstances based upon the totality of information actually known to the officer.

3. Retaliation against a peace officer that reports a suspected violation of a law or regulation of another officer to a supervisor or IA is prohibited.

C. <u>VERBAL WARNING</u>




If feasible, and if doing so would not increase the danger to the peace officer or another person, the peace officer shall make every attempt to identify themselves and to issue a clear and comprehensible verbal warning before using any force that is likely to cause serious bodily injury or death, so that the subject(s) are given the opportunity to submit to the authority of the peace officer.

D.  RENDERING MEDICAL AID

Peace officers on scene shall promptly render aid and/or summon medical assistance when reasonable and safe to do so pursuant to GO 522.02 (Emergency Care for Individuals Under Police Care or Control) when any UOF has resulted in any type of injury or death regardless of custody status.

E.  USE OF FORCE DURING AN ASSEMBLY, PROTEST, OR DEMONSTRATION

1.  Peace officers using kinetic energy projectiles or chemical agents during an assembly, protest, or demonstration shall ensure that such force is used pursuant to RM 532.11 (First Amendment Assembly Manual) and GO 580.12 (Less Lethal Munitions).

2.  Peace officers shall only use kinetic energy projectiles or chemical agents during an assembly, protest, or demonstration if the use is objectively reasonable to defend against a threat of life or serious bodily injury to any individual, including a peace officer, or to bring an objectively dangerous and unlawful situation safely and effectively under control, and only in accordance with all of the following requirements:

    a.  De-escalation techniques or other alternatives to force have been attempted, when objectively reasonable, and have failed.

    b.  Repeated, audible announcements are made announcing the intent to use kinetic energy projectiles and chemical agents and the type to be used, when objectively reasonable to do so. The announcements shall be made from various locations, if necessary, and delivered in multiple languages, if appropriate.

    c.  Persons are given an objectively reasonable opportunity to disperse and leave the scene.

    d.  An objectively reasonable effort has been made to identify persons engaged in violent acts and those who are not, and kinetic energy projectiles or chemical agents are targeted toward those individuals engaged in violent acts. Projectiles shall not be aimed indiscriminately into a crowd or group of persons.

    e.  Kinetic energy projectiles and chemical agents are used only with the frequency, intensity, and in a manner that is proportional to the threat and objectively reasonable.

    f.  Officers shall minimize the possible incidental impact of their use of kinetic energy projectiles and chemical agents on bystanders, medical personnel, journalists, or other unintended targets.

    g.  An objectively reasonable effort has been made to extract individuals in distress.

    h.  Medical assistance is promptly provided, if properly trained personnel are present, or procured, for injured persons, when it is reasonable and safe to do so.

    i.  Kinetic energy projectiles shall not be aimed at the head, neck, or any other vital organs.

    j.  Kinetic energy projectiles or chemical agents shall not be used by any law enforcement agency solely due to any of the following:

        (1) A violation of an imposed curfew.

        (2) A verbal threat.

        (3) Noncompliance with a law enforcement directive.

    k.  If the chemical agent to be deployed is tear gas, only a lieutenant or above  at the scene of the assembly, protest, or demonstration may authorize the use of tear gas.

F.  GENERAL CONSIDERATIONS GOVERNING USE OF FORCE

1.  Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force necessary to effect the arrest, to prevent escape, or to overcome resistance.

2.  A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose his right to self-defense by the use of objectively reasonable force in

 
compliance with subsections E.1 and F.1-2 to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this paragraph, "retreat" does not mean tactical repositioning or other de-escalation tactics.

3. A peace officer shall consider the principles of proportionality in looking at the totality of the circumstances by weighing the severity of the offense, the reasonably perceived level of resistance and the need for apprehension prior to the utilization of force. A peace officer shall continually evaluate tactics when determining the appropriate UOF response.

4. The decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and department policies.

5. The decision by a peace officer to use force shall be evaluated from the perspective of a reasonable peace officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight. The totality of the circumstances shall account for occasions when peace officers may be forced to make quick judgments about using force.

   a. Circumstances of consideration may include, but are not limited to:
      (1) The immediacy and severity of the perceived threat
      (2) The conduct of the subject
      (3) Officer versus subject factors such as age, size, relative strength, skill level, injuries sustained, level of exhaustion and number of peace officers available versus subjects
      (4) The conduct of the involved peace officer
      (5) The effects of drugs or alcohol
      (6) The subject's apparent mental state or capacity
      (7) The subject's apparent ability to understand and comply with officer commands
      (8) The proximity or access of weapons to the subject
      (9) The level of threat or resistance presented by the subject
      (10) The availability of other reasonable and feasible options and their possible effectiveness
      (11) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained
      (12) The seriousness of the subject offense or reason for contact with the subject
      (13) The training and experience of the peace officer
      (14) The potential for injury to peace officers, subjects or another person
      (15) Whether the person appears to be resisting, attempting to evade arrest by flight, or is attacking the peace officer
      (16) The risk and reasonably foreseeable consequences of escape or apparent attempt by the subject
      (17) Prior contacts with the subject or awareness of any propensity for violence
      (18) Environmental factors and/or other exigent circumstances
      (19) The availability of other resources

      Not all of the above factors may be present or relevant in a particular situation, and there may be additional factors not listed.

6. When using force, a peace officer should only use techniques and equipment that are approved by the department. Circumstances may arise in which a peace officer reasonably believes that it would be impractical or ineffective to use any of the tools, weapons or techniques provided by SPD. A peace officer may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the peace officer may resort to using any objectively reasonable means of force. The use of any improvised device or method must nonetheless be objectively reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose.




Case 2:26-cv-00146-WBS-AC    Document 1    Filed 01/16/26    Page 46 of 90

7.  When feasible, peace officers shall attempt to de-escalate situations.
8.  When a peace officer reasonably believes they are dealing with a mentally ill, developmentally disabled, or an emotionally disturbed subject, the officer shall, if time and circumstances reasonably permit, utilize CIT.

F.  CONSIDERATIONS GOVERNING USE OF DEADLY FORCE
1.  Notwithstanding subsection E.1, a peace officer is justified in using deadly force upon another person only as a last resort when reasonable alternatives have been exhausted or are not feasible and the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:
    a.  To defend against an imminent threat of death or serious bodily injury to the officer or to another person.
    b.  To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.
2.  A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.
3.  A subject gaining control of one or more pieces of a peace officer's equipment, without the subject presenting an imminent threat of serious bodily injury or death, is not enough by itself to justify the use of deadly force.
4.  A peace officer may discharge a firearm in the performance of their official duty:
    a.  Pursuant to Section F. 1.-4; or
    b.  At a firing range, pursuant to all safety rules and regulations; or
    c.  In order to stop a potentially aggressive animal, such as a dog, if the animal reasonably appears to pose an imminent threat of serious bodily injury or death to a peace officer or to another person and alternative methods are not feasible or would likely be ineffective.
        (1) In circumstances where there is sufficient advance notice that a potentially dangerous animal may be encountered, department members should develop reasonable contingency plans for dealing with the animal (e.g., fire extinguisher, Conducted Energy Device, oleoresin capsicum (OC) spray, animal control peace officer). Nothing in this policy shall prohibit any member from shooting a dangerous animal if circumstances reasonably dictate that a contingency plan has failed or becomes impractical.
5.  Firearms shall not be discharged as a warning.
6.  Peace officers shall consider their surroundings and potential risks to bystanders and other peace officers to the extent reasonable under the circumstances, before discharging a firearm.
7.  When a peace officers discharges or attempts to discharge a firearm while on or off duty, intentionally or accidentally, the employee shall immediately notify the on-duty watch commander. This does not include intentional discharges at a range or for recreational purposes (e.g., hunting, private target practice, or other similar activities).

G.  PROHIBITED USES OF FORCE
1.  Peace officers shall not use force:
    a.  By means of a carotid restraint, choke hold, or any other type of neck restraint.
    b.  Or utilize any transport methods that involve a substantial risk of positional asphyxia.
    c.  Against subjects who are not subject to arrest or detention, except to protect the officer or another person.
    d.  Against subjects who are handcuffed or otherwise restrained, except where the subject is actively resisting, attempting escape, or poses an imminent threat of harm to the peace officer, themselves or another person.




    e.   For the sole purpose of preventing the exercise of first amendment rights, when a legitimate law enforcement purpose does not exist.

    f.   For the sole purpose punishment or retaliation.

    g.   To stop a subject from swallowing a substance that is already in their mouth.

H.  <u>VERBALIZATION DURING UNLAWFUL ASSEMBLY OR PROTEST</u>

    1.   When feasible, peace officers should verbalize any use of force that is utilized during a mass protest/unlawful assembly. The following should be verbalized on body worn camera:

        a.   Location of where the use of force occurred

        b.   Type of force that was utilized

        c.   Reason for the use of force

        d.   Description of subject for whom the use of force was intended

I.  <u>FORCE OPTIONS</u>

    1.   Peace officers have a variety of force options available to them.  Peace officers do not need to follow a continuum of force but shall select the UOF they deem appropriate for the circumstances, ensuring their UOF complies with the law, the provisions of this policy and any specific SPD policies or manuals governing the type of force they select to use.

    2.   Peace officers shall continue to assess their UOF selection and either transition to a different UOF option or discontinue a UOF based on their assessment, ensuring their UOF option remains reasonable for the circumstances.

    3.   Equipment for Sworn Peace Officers

        a.   Issued and required on person

            (1)  Firearm

            (2)  Conductive Energy Devices (CED)

            (3)  Impact weapons (Baton)

            (4)  Handcuffs

            (5)  Radio

            (6)  Oleoresin Capsicum (OC) spray

            (7)  Body Worn Camera (BWC)

            (8)  Flexible Body Armor

        b.   Issued and need to have readily available. This is not a complete list of other issued equipment:

            (1)  Less Lethal Shotgun (readily available in patrol vehicle)

            (2)  Patrol rifle (readily available in patrol vehicle and for qualified sworn personnel)

            (3)  Flashlight

            (4)  Gas Mask

            (5)  Ballistic Helmet

            (6)  Orange reflective vest

    4.   Required Equipment Issuance and UOF options for Non-Sworn Uniformed Department Personnel

        a.   Issued and required on duty belt:

            (1)  Oleoresin Capsicum (OC) spray

            (2)  Conductive Energy Devices (CED)

    5.   UOF Options for Sworn Peace Officers

        a.   The following is an alphabetical list of UOF options.  This is not a complete list of options:

            (1)  Bola Wrap

            (2)  Chemical Agents

            (3)  Conductive Energy Devices (CED)

            (4)  Control Holds

            (5)  Discharge of Firearms and Other Deadly Force

            (6)  Impact Weapons (baton)

            (7)  Less Lethal Weapons Systems

            (8)  Personal Body Weapons



    (9) Pointing of a Firearm at a Person

    (10) Takedowns

    (11) Use of Canine

    (12) Verbal Commands/Instructions/Command Presence

6. UOF Options for Authorized, Non-Sworn Uniformed Personnel

    a. Authorized non-sworn uniformed department personnel shall only use the CED or OC in immediate defense of themselves or another member of the department.

    b. Authorized non-sworn uniformed department personnel who use the CED or OC in defense of themselves or another person shall:

        (1) Attempt to get away from the situation as soon as possible.

        (2) Call for code-3 assistance from sworn peace officers as soon as feasible.

7. The following is a list of SPD policies and manuals address specific UOF topics:

    a. GO 522.02 (Emergency Care for Individuals Under Police Care or Control)

    b. GO 580.03 (Use of Force Reporting, Investigations and Response)

    c. GO 580.06 (De-escalation and Planned Response)

    d. GO 580.04 (Firearms)

    e. GO 580.10 (Use of the Conductive Energy Device (CED))

    f. GO 580.12 (Less Lethal Weapons Systems)

    g. GO 580.14 (Use of Canine)

    h. RM 523.02 (Search and Handcuff Manual)

    i. RM 532.09 (Arrest of Passive Resisters Manual)

    j. RM 532.11 (Crowd and Riot Control Manual)

    k. RM 580.07 (Chemical Agents Manual)

    l. RM 580.08 (Baton Manual)

J. **USE OF PERSONAL BODY WEAPONS (PBWs)**

1. A peace officer may use PBWs to transition to a better position of advantage (i.e., positional change, handcuffing, etc.) to create distance/space, or overcome an assaultive subject.

2. When PBWs are used, peace officers must continually evaluate the ability to transition to a more advantageous position and/or recognize the signs of submission/compliance by the subject.

3. PBWs shall not be utilized against subjects solely engaging in passive non-compliance or merely active resistance.

4. PBWs should not be used on handcuffed persons unless they are exhibiting active aggression and/or to prevent subjects from harming themselves or another person.

K. **USE OF A CONDUCTIVE ENERGY DEVICE (CED)**

1. The CED shall be used pursuant to GO 580.10 (Use of the Conducted Energy Device).

2. A peace officer may deploy and use the CED under the following circumstances:

    a. To incapacitate a subject whose conduct rises at least to the level of active resistance.  This includes threats or pre-indicators leading up to assaultive or resistive behavior.

    b. To incapacitate a suicidal subject who can't be safely controlled through crisis intervention techniques or other force options.

3. Peace officers shall avoid using the CED for more than a total of three (3) five-second cycles (15 seconds), unless the totality of the circumstances are such that a reasonable peace officer would conclude that each subsequent application of the CED, analyzed separately, is warranted by the imminent threat to the officer or another person.

4. CED deployment shall cease when the subject no longer poses an imminent threat of harm to the peace officer or another person.

5. The use of the CED is considered a serious UOF.  Each individual cycle of the CED must be objectively reasonable under the circumstances.

6. The CED should not be used on handcuffed persons unless they are actively resisting or exhibiting active aggression and/or to prevent subjects from harming themselves or another person.

 
L.  POINTING A FIREARM
1.  Nothing in this policy shall preclude a peace officer from drawing of a firearm when the officer reasonably believes it necessary for the safety of the officer or another.
2.  Detentions involving the pointing of a firearm at a person shall be entered into the Racial Identify Profiling Act database (RIPA) pursuant to GO 210.09.
3.  The pointing of a firearm at a person shall be documented in the appropriate report, RIPA and on the Computer Aided Dispatch (CAD) call using the abbreviation "FPAP" (Firearm Pointed At Person).

LI.  MOVING VEHICLES
1.  A peace officer shall make every reasonable effort to move out of the path of an approaching vehicle.
2.  A peace officer shall make every reasonable effort to not intentionally place themselves in a position where a vehicle could be perceived as a threat to the officer.
3.  Peace officers shall not discharge a firearm at or from a moving vehicle unless one of the following circumstances exists:
    a.  The peace officer reasonably believes that there is an imminent threat of death or serious bodily injury to a peace officer or another person, by means other than the moving vehicle.
    b.  The peace officer reasonably believes that the driver is using or is attempting to use the vehicle as a means to cause imminent threat of death or serious bodily injury to the peace officer or another person.

LII.  TRAINING
1.  At least annually, all sworn personnel shall receive training related to this agency's UOF policy and related legal updates for the following:
    a.  Legal standards for UOF
    b.  Duty to intercede
    c.  The use of objectively reasonable force
    d.  Supervisory responsibilities
    e.  UOF review and analysis
    f.  Guidelines for the use of deadly force
    g.  State required reporting
2.  Additional regular and periodic training shall include:
    a.  Training standards and requirements relating to demonstrating knowledge and understanding of the law enforcement agency's UOF policy.
    b.  Training and guidelines regarding vulnerable populations, including, but not limited to, children, elderly persons, people who are pregnant, and people with physical, mental, and developmental disabilities.
    c.  Minimum training and course titles related to the objectives in the UOF policy include but are not limited to, the standards in Peace Officers Standards and Training (POST) Learning Domain 20 (Use of Force), and the following:
        (1)  De-escalation and interpersonal communication training, including tactical methods that use time, distance, cover, and concealment, to avoid escalating situations that lead to violence.
        (2)  Implicit and explicit bias and cultural competency.
        (3)  Skills including de-escalation (crisis intervention) techniques to effectively, safely, and respectfully interact with people with disabilities or behavioral health issues.
        (4)  Alternatives to the use of deadly force and physical force, so that de-escalation tactics and less lethal alternatives are, where feasible, part of the decision-making process leading up to the consideration of deadly force. Enhancing a peace officer's discretion and judgment in using less lethal and deadly force in accordance with this policy.
        (5)  Mental health and policing, including bias and stigma.
        (6)  Using public service, including the rendering of first aid, to provide a positive point of contact between law enforcement peace officers and community members to increase trust and reduce conflicts.
        (7)  UOF scenario training including simulations of low-frequency, high-risk situations and calls for service, shoot-or-don't-shoot situations, and real-time force option decision making.




3. All UOF training provided to all sworn personnel shall be documented by the department.
4. Any officer that receives a sustained internal affairs complaint for excessive force will not be allowed to train any officer(s) for a period of three years from the date the complaint is substantiated. This includes:
   a. Field training
   b. In-service training
   c. Academy instruction or evaluation
   d. Roll Call presentations
5. Officers shall advise any supervisor that tasks him/her with a training assignment that they are not authorized to instruct, teach, or train.  Failure to do so will be cause for discipline.
   a. The officer is not obligated to go into detail about the prior incident or complaint as to why they cannot train other than to advise the supervisor that in accordance with applicable law they are not authorized to train at that time.

O. <u>REPORTING</u>
1. Supervisors Responsibilities. Upon notification of a reportable UOF, the peace officer's field supervisor shall:
   a. Respond to the location of the arrest to ensure that a thorough investigation takes place. A thorough investigation into a UOF by a peace officer should include, but is not limited to, an area canvass (for witnesses, evidence and surveillance video), witness statements (which should be obtained by a supervisor or peace officers not involved in the UOF), subject statements, and photographs of the scene and any injuries. If the supervisor is unable to respond to the location of the arrest, the supervisor shall note the reasons why on the call.
   b. Review the incident with the arresting peace officer and/or other officers.
   c. Review all recordings (both audio and video) of the event, including In-Car Camera, Body Worn Camera video, and any available surveillance video).
   d. Assess the appropriateness of the UOF and any charge(s) against the subject.
   e. Consider arranging for other peace officers to transport and book the subject in the event the subject continues to display hostile, confrontational, or oppositional behavior toward the arresting officer(s).
   f. A peace officer's field supervisor shall advise the watch commander of any incident involving UOF and initiate a management level review by making a tracking software entry whenever the following reportable UOF events occur:
      (1) Any reportable UOF that results in the subject requiring a medical clearance (Fit for Incarceration report) prior to booking or, if the subject is not booked into jail or juvenile hall, any injury that would likely require a Fit for Incarceration report.
      (2) Any reportable UOF, involving the discharge of a firearm, a canine bite, or the use of an impact weapon, chemical agent, or CED.
      (3) Any reportable UOF that deviates from the techniques taught or the equipment provided by the department.
      (4) Any UOF the supervisor or Watch Commander determines should be subject to a management level review.
   g. The field supervisor shall enter the following information into the tracking software:
      (1) peace officer(s) involved
      (2) type of force used
      (3) extent of injuries (if any) to the peace officer and/or subject
      (4) supervisor's response or reason for no response
      (5) any administrative actions taken by a supervisor or other managerial personnel
      (6) all pertinent documents related to the incident (i.e. Red Border, Blue Border, Taser download, etc.)
   h. Tracking software entries should be completed within 30 days of the incident date and routed in accordance to department procedure.

Case 2:26-cv-00146-WBS-AC   Document 1   Filed 01/16/26   Page 51 of 90




    (1) In cases where a firearm has been discharged or the UOF results in serious bodily injury or death, the tracking software entry shall be completed by FIT personnel.

    (2) All uses of force shall be categorized using the level of force definitions. (See Appendix #1.)

P.  <u>DISCLOSURE OF PUBLIC RECORDS</u>

The department will disclose public records pursuant to applicable law, including Penal Code Section 832.7.

Q.  <u>REPORTING TO THE CALIFORNIA DEPARTMENT OF JUSTICE</u>

PSU shall submit statistical data regarding all qualifying officer-involved shootings and incidents involving UOF resulting in serious bodily injury is to be reported to the California Department of Justice (URSUS) as required by Government Code Section 12525.2.

R.  <u>COMPLIANCE</u>

Any member of the public can submit a complaint to any member of the Department and in any form (i.e. in person, telephone, email, etc.). Once the complaint is received, it should be routed to the Internal Affairs Division in accordance with General Order 220.01 (Personnel Complaints).

S.  <u>LEGAL REFERENCES</u>

1. California Penal Code Sections 196, 835a, 13652 and 13652.1.

2. California Government Code Sections 7286 and 12525.2.

3. *GRAHAM V. CONNOR* 490 U.S. 386 (1989) sets the legal standard for reasonable force. The court's decision "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an imminent threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." In addition, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on scene, rather than with 20/20 vision of hindsight... the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."

4. *TENNESSEE V. GARNER* 471 U.S. 1 (1985) is a civil case in which the Supreme Court of the United States held that, under the Fourth Amendment, when a law enforcement officer is pursuing a fleeing suspect, the officer may not use deadly force to prevent escape unless "the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." It was found that use of deadly force to prevent escape is an unreasonable seizure under the Fourth Amendment, in the absence of probable cause that the fleeing suspect posed a physical danger.


Case 2:26-cv-00146-WBS-AC   Document 1   Filed 01/16/26   Page 52 of 90

| LEVEL 1 | LEVEL 2 | LEVEL 3 |
|---|---|---|
| <ul><li>UOF resulting in death</li><li>UOF resulting in Serious Bodily Injury (SBI)</li><li>Officer involved shooting resulting in injury or death</li><li>Officer involved shooting-subject missed</li><li>Use of vehicle as weapon resulting in SBI</li><li>In-custody death</li><li>Use of non-issued equipment resulting in SBI or death</li></ul> | <ul><li>Officer involved shooting of an animal</li><li>Canine bite</li><li>CED deployment-probe</li><li>Use of chemical agents</li><li>Use of baton</li><li>Use of CED drive stun</li><li>Use of personal body weapons</li><li>Use of less lethal weapons systems</li><li>Use of BolaWrap®</li></ul> | <ul><li>Any UOF used to overcome a combative, physically aggressive, or fleeing subject who has delayed, obstructed, or fought with an officer</li><li>Any UOF that results in a visible injury or complaint of pain by the subject to whom force was applied to. Example: visible scratch, abrasion, complaint of pain however not minor discomfort by application of certain control holds or handcuffs</li></ul> |




Case 2:26-cv-00146-WBS-AC    Document 1    Filed 01/16/26    Page 53 of 90

| REPORTING REQUIREMENTS FOR LEVEL 1 | REPORTING REQUIREMENTS FOR LEVEL 2 | REPORTING REQUIREMENTS FOR LEVEL 3 |
|---|---|---|
| <ul><li>Sergeant notification</li><li>Homicide call out</li><li>CSI request</li><li>IAD call out</li><li>PSU call out</li><li>PIO call out</li><li>District Attorney response team</li><li>OPSA</li><li>Crime or casualty report</li><li>Red border form (RM 3)</li><li>Tracking software entry</li></ul>All call outs are based on the needs of the incident. | <ul><li>Sergeant notification</li><li>Crime or casualty report</li><li>CSI request</li><li>Red border form (RM 3)</li><li>Tracking software entry</li><li>Watch commander investigation (shooting of an animal)</li></ul> | <ul><li>Sergeant notification</li><li>Incident/crime report</li><li>CSI request</li><li>Red border form (RM 3) if there is visible injury</li><li>No tracking software entry</li></ul> |

# EXHIBIT 2

 

**SACRAMENTO POLICE DEPARTMENT**
**GENERAL ORDERS**

**580.14**
**USE OF CANINES**
**6-27-22**

## PURPOSE
This policy establishes guidelines for the use of department canines to augment police services in the community including, but not limited to, locating suspects, contraband and apprehending criminal offenders.

## POLICY
The Sacramento Police Department values the sanctity of human life and the freedoms guaranteed by the United States and California Constitutions. It is the policy of the Sacramento Police Department that canine handlers meet and maintain the appropriate proficiency to effectively and reasonably carry out legitimate law enforcement objectives pursuant to GO 580.02 Use of Force policy and GO 522.02 Emergency Care for Individuals in Police Care or Control policy.

## PHILOSOPHY
The Sacramento Police Department's primary use of canines is to safely locate suspect(s) in areas that are difficult or dangerous to search, while preserving the handler's option to use minimal force or avoid force altogether, to apprehend and place the suspect into custody. Canines will be deployed based on the criteria listed in this policy. Nothing in this policy supersedes the Sacramento Police Department's Use of Force Policy to include de-escalation, proportionality, and or crisis intervention techniques.

The Sacramento Police Department primarily deploys canines utilizing voice commands from the handler as a method of control. Repeated notice on the presence of a canine and request to surrender are given during a deployment when possible. The canines are deployed for suspects wanted for violent felonies, specific felonies listed in this policy, other crimes where a suspect is fleeing and officers believe the suspect is armed with a weapon, or when a suspect is actively resisting arrest. The canine is used to search and locate a suspect(s). Should the suspect(s) surrender the canine will be called back by the handler. Should the suspect resist or continue to evade officers, the canine will engage the suspect and be called off as soon as safely possible by the handler.

## PROCEDURE
A. <u>DEFINITIONS</u>
   1. Canine handler - Sworn members who have been POST trained and have attended the canine training school to be certified and qualified to perform all responsibilities of a canine handler.
   2. Handler control methodology - The training methodology employed by the department for both the canine and handler in which the handler demonstrates that they are able to maintain physical or verbal control over the actions of their canines.
B. <u>GENERAL</u>
   1. Approval shall be obtained from a field supervisor prior to using a canine to search for, or apprehend, a suspect. Exception: A rapidly evolving situation that is within the deployment guidelines, but in which it is impractical to obtain supervisory approval.


NOTE:  It is recognized that situations may arise that do not fall within the provisions set forth in this policy; in such a case, **a watch commander can use a standard of reasonableness to review the decision** to deploy a canine in view of the totality of circumstances.

2.  Watch commanders shall notify the Metro Special Operations Section Lieutenant of any performance issues regarding handlers or canines.

3.  ████████████████████████████████████████████████████

C. DEPLOYMENT GUIDELINES

The deployment of a canine shall be continuously re-evaluated during an incident to determine appropriateness of its use. During deployments when practical and safe to do so, the handler shall try to maintain visual sight, verbal control and/or have physical control of the canine.

1.  Canines shall not be deployed for subjects in the following circumstances:
    a.  Infractions
    b.  Misdemeanor crimes not involving a weapon likely to cause serious bodily injury (such as simple assault, petty theft, vandalism, city code violations)
    c.  Mere flight from an officer unless one of the factors in C. 2. are present
    d.  Petty thefts that escalate to the level of a robbery due to the suspect's resistance towards the victim's efforts to stop the theft (absent actions resulting in great bodily injury (GBI) or a weapon being involved).
    e.  Stolen vehicles involving a named suspect or civil in nature such as a rental car non-return
    f.  Protest or crowd control situations

2.  Canines can be deployed for suspects in the following circumstances:
    a.  Wanted for violent felonies (such as homicide, robberies, kidnapping, serious assaults, drive by shootings, sexual assaults)
    b.  Reasonable belief the person may be in possession of a weapon likely to cause serious bodily injury
    c.  Specific felony property crimes:
        i.    Burglaries
        ii.   Stolen vehicles (when factors in section C.1.e don't exist)
        iii.  Felony vehicle evading
    d.  Warrant service where any of the following are met:
        i.    Wanted for violent felony
        ii.   Has a violent criminal history
        iii.  Has a criminal history with firearms
        iv.   Has a criminal history of felony evasion or being physically assaultive towards law enforcement
    e.  Suspect is actively resisting arrest

3.  When a canine has engaged a suspect, the handler shall direct the canine to release its hold as quickly as possible when the totality of the circumstances indicates the suspect is surrendering or when adequate resources are available to take the suspect safely into custody. Factors in assessing when a suspect is surrendering include, but are not limited to:
    a.  Suspect verbally surrenders
    b.  Suspect's hands can be seen and are not in possession of a weapon
    c.  Suspect physically complies (i.e., hands in the air, follows verbal commands or body language indicative of surrendering)

 

D. CONSIDERATIONS PRIOR TO DEPLOYMENT

Prior to the use of a department canine to search for or apprehend a suspect, the canine handler and/or supervisor at the scene shall consider all pertinent information reasonably available at the time. The information shall include, but is not limited to:

1. The suspect's age or an estimate thereof.
2. The nature of the suspected offense.
3. Any potential danger to the public and/or other officers at the scene if the canine is utilized.
4. The degree of resistance, if any, the suspect has shown.
5. The potential for escape or flight if the canine is not utilized.
6. The potential for injury to officers or the public caused by the suspect if the canine is not used.
7. Ability of suspect to understand and comprehend canine warnings to include mental health, language and other disabilities.
8. Having other less lethal force options available to aid the canine during a deployment.

E. BUILDING AND AREA SEARCHES

Whenever practical, a perimeter should be established before the canine is used for a building/area search. Canine officers shall:

1. If necessary, make search recommendations to the field supervisor.
2. Provide verbal warnings in a loud voice, or by use of amplified sound prior to releasing the canine:
   a. Announce the presence of the canine unit.
   b. Order the suspect out of hiding.
   c. Warn the suspect that he or she may be bitten.
   d. After allowing for a reasonable period of compliance, repeat the warning. If no response is received after again waiting for a reasonable period of compliance, the search may begin.
   e. With the approval of the watch commander, the canine handler may omit or forgo canine warnings when exigent circumstances exist.
3. Repeat additional warnings when appropriate and safe to do so or when encountering structures where initial canine warnings may not have been heard. Supervisors and canine handlers should consider foregoing additional canine warnings when either of the following are present:
   a. when there is increased risk to officer safety due to the reasonable belief the suspect (s) is armed with a weapon likely to cause great bodily injury
   b. where the suspect (s) continues to elude officers during an area search based on the proximity of the canine
4. ██████████████████████████████████
   ██████████████████████████████████
   ████████████████.
5. Officer should attempt to contact residents prior to utilizing a canine for yard searches. If a resident or responsible is unable to be contacted, then an additional canine warning shall be made by the handler prior to deploying the canine to search the backyard.
6. Advise Communications after initial warnings are given, and when possible, record on In Car Camera (ICC) and/or Body Worn Camera (BWC).
   a. When feasible for area searches, verify the announcement could be heard by another officer on the perimeter opposite of the warning.
7. Notify communications and perimeter officers that the search has begun.
8. Maintain verbal control and frequent visual contact of the canine during the search.

 
F. CANINE OFFICERS
1. Canine officers shall:
   a. Take a pro-active approach in dealing with priority calls, game plans, and attempt pickups where the use of a police canine would benefit the safety of the public and the officers involved.
   b. When applicable, notify the field supervisor if there is a possibility of a potential canine deployment within that supervisor's area of responsibility.
2. Canine officers should not:
   a. Be assigned to handle routine report calls.
   b. Be dispatched to misdemeanor calls; i.e., 415s, 5150s, 901s, or traffic control.

G. CANINE SERGEANT
1. Intentional Apprehensions
   a. The canine Sergeant shall be notified as soon as practical regarding the apprehension and the circumstances of the call.
   b. The canine Sergeant shall review all pertinent reports, in-car camera video and body worn camera video related to the canine apprehension.
   c. Based on the review, the canine Sergeant may go over the incident with the handlers but will not determine any policy findings pending outcome from the Use of Force committee.
2. Unintentional Bite
   a. The canine Sergeant shall:
      i. be notified as soon as possible of any unintentional apprehension.
      ii. respond to the scene when possible.
      iii. notify the Metro Special Operations Section Lieutenant.
      iv. review all pertinent in-car camera video and body worn camera video related to the apprehension.
      v. coordinate with the Professional Standards Unit and the Metro Command to determine if a field settlement agreement is appropriate based on the totality of the incident.
      vi. identify any training lessons learned from the incident and address with the handler and canine unit for educational and training purposes after concurrence by the Metro Captain that no policy violations need to be addressed.
      vii. ensure a report and a red border form (RM3) is completed.
      viii. document findings in a memorandum to the Deputy Chief of Office of Specialized Services.

H. CARE OF CANINE AND EQUIPMENT
1. Canine officers shall:
   a. Be responsible for the health and welfare of the canine, ensuring that the canine receives the proper nutrition, grooming, training, medical care, and living conditions.
   b. Not expose the canine to any foreseeable and unreasonable risk of harm, unless required by a particular application.
   c. Maintain department canine equipment under their control in a clean and serviceable condition.
   d. Permit the canine unit sergeant to conduct on-site inspections of affected areas of the residence to verify that conditions and equipment conform to this policy. The canine unit sergeant shall minimally provide 24-hour notice prior to the inspection.


  e. Report to the canine unit sergeant any changes in living status that may affect the lodging or environment of the canine.

  f. Report any injury or illness of the canine to the canine unit sergeant.

  g. Advise the canine unit sergeant prior to taking their canine to the veterinarian for a routine examination or for minor medical problems.

  h. Take the canine to the nearest available veterinarian if the canine is seriously injured or requires immediate medical attention. The canine unit sergeant shall be notified as soon as time permits.

I. TRAINING

 1. Prior to assignment in the field, each canine team shall:

  a. Be trained and certified to meet POST standards.

  b. Receive training as defined in the current contract with the department canine training provider.

  c. Conduct all canine training while on duty unless otherwise approved by the canine sergeant.

  d. Demonstrate an understanding and ability to use the handler control methodology, including the ability to control the canine both physically and with verbal commands.

J. CROSS TRAINED CANINES

 1. Canines trained in more than one discipline shall assist with investigations as directed by the Metro Special Operations Section Lieutenant.

 2. Cross trained canine teams shall meet POST certifications.

 3. Narcotics and firearm detection canines shall:

  a. Assist in the search for narcotics or firearms during a search warrant service.

  b. Search vehicles, buildings, and any other articles deemed necessary.

  c. Not be used to search a person.

 4. Explosives detection canines shall:

  a. Assist in the search of a location where a bomb threat has been established. NOTE: Prior to responding, credibility of the threat shall be assessed.

  b. Conduct preventive searches at locations such as special events, dignitary visits and restricted areas.

  c. Not be used to clear a suspicious package.

  d. Not be used to search a person.

  e. Narcotics, article and explosive searches do not require verbal warnings prior to deployment.

 5. SWAT deployment canines:

  a. Shall be used in SWAT operations. NOTE: Only canine teams that have received specialized training and the approval from the Metro Special Operations Section Lieutenant will be utilized in this capacity.

  b. Shall participate in bi-annual training with the SWAT team.

K. OUTSIDE AGENCY ASSISTANCE

Upon request from an outside agency for the assistance of a department canine, the following conditions shall be met:

 1. The Communications Division shall:

  a. Obtain all necessary information including location, type of incident, suspect description, contact person, etc.

  b. Notify the watch commander.

 

Case 2:26-cv-00146-WBS-AC   Document 1   Filed 01/16/26   Page 60 of 90

2.  The watch commander will respond to the request, taking into consideration personnel availability, the availability of the requesting agency's canine, and whether the need for the canine is consistent with department policy.
3.  Prior to deployment, the canine officer will ensure that the use of the canine is within department policy.
4.  Following a reportable injury caused by canine use of force, the nearest district sergeant or assigned field supervisor shall follow the supervisor's reporting procedures and responsibilities pursuant to GO 580.02 (Use of Force), including the completion of a tracking software entry.

L. REPORTING REQUIREMENTS FOR INJURIES INFLICTED BY A CANINE UPON AN INTENDED SUSPECT AT THE DIRECTION OF THE HANDLER

Canine officers shall:

1.  Ensure first aid is rendered pursuant to (GO 522.02 Emergency Care for Individuals under Police Care or Control).
2.  Notify the district sergeant, who shall follow the supervisor's reporting procedures and responsibilities pursuant to GO 580.02 (Use of Force), including the completion of a tracking software entry.
3.  Obtain a statement from the intended suspect or witnesses relevant to the use of the canine when possible.
4.  Notify CSI for photos of suspect's injury(ies). If CSI is unavailable, notify the district sergeant for photographs.
5.  Complete appropriate reports detailing the incident including documentation of warnings issued prior to the deployment of the canine when applicable.
6.  Complete a red border form (RM 3).

M. REPORTING REQUIREMENTS FOR INJURIES INFLICTED BY A CANINE UPON AN UNINTENDED INDIVIDUAL

Canine officers shall:

1.  Ensure first aid is rendered pursuant to (GO 522.02 Emergency Care for Individuals under Police Care or Control).
2.  Notify the watch commander and canine sergeant.
3.  Ensure an attempt was made to obtain a statement from the individual who was unintentionally injured by the canine or witness(es) relevant to the use of the canine when possible.
4.  Notify CSI for photos of victim's injury(ies). If CSI is unavailable, notify the district sergeant and request they respond for photographs.
5.  The canine sergeant will coordinate with the Professional Standards Unit and the Metro Command to determine if a field settlement agreement is appropriate based on the totality of the incident.
6.  Complete appropriate reports or department memorandum detailing the incident, including circumstances that led or contributed to the unintended bite.
7.  Complete a City of Sacramento Workers' Compensation form WC001 (first report of injury form) if a City employee is the unintended individual.
8.  Complete a red border form (RM 3).

N. ADMINISTRATIVE REVIEW

1.  The canine unit sergeant shall:
    a.  Review all incidents in which a department canine injures any person. This does not  replace or circumvent the Use of Force committee.


Case 2:26-cv-00146-WBS-AC   Document 1   Filed 01/16/26   Page 61 of 90

    b. Notify the Metro Special Operations Section Lieutenant of any deployment or training issues.

    c. When applicable, implement corrective and/or preventative action for any training, equipment, or canine issues that have been discovered as a result of the review. Any corrective actions should be approved by the Metro Captain so there is no conflict based on the Use of Force committees recommendations.

    d. Maintain a record, cross referenced by officer, on all injuries involving department canines for a period of five (5) years from the date of injury.

2. The Metro Captain and the Metro Special Operations Section Lieutenant shall:

    a. Review all incidents in which a department canine injures any person.

    b. Review the Blue Team entry, making a determination as to the appropriateness of the use of the canine.

    c. The deployment is then brought before the Use of Force Committee to determine whether the incident is within policy.

# EXHIBIT 3

Case 2:26-cv-00146-WBS-AC     Document 1     Filed 01/16/26     Page 63 of 90

Sacramento Sheriff K-9 Association          Apply Today

 **Sacramento County Sheriff's K-9** | Home     **K-9 Documents**     K-9 | Co

# K-9 Documents

K-9 Main Roster

K-9 Uniform Roster

K-9 Vehicle Roster

K-9 SOP

# K.9. Division S.O.P.

## Prepared for [SCSD  K.9.]
## Created by [C. White]



## 1.1 SOP OVERVIEW

The following sop is not a recommendation it is **mandatory** if you are caught not following the SOP

<u>IT WILL RESULT IN IMMEDIATE DISCIPLINARY ACTION.</u>

## 1.2 DISCIPLINE POLICY

**Any rule infractions may result in a STRIKE or a SUSPENSION of K9 duties depending on the severity.** If caught breaking the rules as K.9. Then you will be given a strike or if needed you will be relieved from your handler duties.

## 1.3 Our MISSION

The mission of a K9 unit is to assist the units of the state of California in the efforts of prevention of crime and detection, and officer safety. K9 units will assist in the identification of illegal narcotics (If trained to), the capture and neutralisation of fleeing suspects when on the run, and assist in the recovery of missing persons and capture of fugitive suspects.

## 1.4 After accepted

After being accepted into the sub-division you will be required to finish training once you complete this training you will be able to become a K9 dog as well as a handler.

## 1.5 Jurisdiction

Your jurisdiction will be the same as the department you should never break jurisdiction except for a high priority call.

## 1.6 The 4 basic commands

These are the 4 basic commands you will use as a K9 Handler: Heel, Sniff, Door and Neutralise. **Say the name of the dog before the command**!

Heel: Dog goes to handler and follows them.

Sniff: Dog sniffs wherever its handler is pointing.

Door: Dog either steps in or out of the handler's cruiser.

Neutralise: Dog chases and takes down the suspect.

## 1.7 Rules and Regulations as a dog

A K9's bite is non-lethal force which means that it can not cause any deadly harm to anyone. **As a dog, you will always follow commands from your handler, and you will need commands before doing anything.** *However*, there are a few situations where you don't need a command to neutralise someone. You *can* sniff a vehicle if there is a suspect inside. You can bite/neutralise a civilian, if they step too close to you, try to pet you, try to give you food, or if you feel threatened, and if someone shoots or hurts your handler, you can neutralise them without getting a command as a dog. You should NOT be biting a cop for any reason other than if they are aggressive (physically harming you or your handler) and if they are doing this the handler should be getting their name and badge number and requesting their supervisor.

### 1.8 Rules and Regulations as a handler

As a Handler you will always follow your dog at any time, and <u>never leave the dog behind</u>. T**he dog is your first priority as the dog counts as an officer**, it is not just a pet, so keep them close to you. **You cannot transport a suspect as a K9 unit.** In a 10-80, the Ideal positions are 3rd and 2nd, but if you have to be primary, **you cannot go for a PIT.** In a 10-70, you will follow your dog at all times. In a breach, the ideal order is K9 DOG, K9 HANDLER and the rest. If you are patrolling as <u>1 handler : 1 dog</u>, the handler and the dog will create a union together. **<u>You can patrol as 2 handlers and 1 K9 dog at max</u>**, if you are 2 handlers and 1 dog, the handlers will go in a union but the dog will not be in the union.

EXHIBIT 4



# POST Law Enforcement K-9 Guidelines

**California Commission On Peace Officer Standards and Training**

*Produced By POST Management Counseling and Projects Bureau*

**POST Law Enforcement K-9 Guidelines**

© 2024 by California Commission on Peace Officer Standards and Training

Published June 2024, November 2024

All rights reserved. The contents of these guidelines are intended for use only in a POST-certified program [or by a state agency receiving POST-training]. POST does not warrant, and in fact disclaims, the suitability of the material for any other use. Any person using the material for any other purpose assumes all responsibility and risk associated with such use.

Any use of or reference to the contents of this manual shall include an acknowledgment that the manual was created by the California Commission on Peace Officer Standards and Training (POST), except for material that is attributed to, copyrighted, or credited to anyone other than the Commission on POST. Any reference to this manual in other material should not state or imply that such other material meets state of California or POST standards.

This publication may not be reproduced, in whole or in part, in any form or by any means electronic or mechanical or by any information storage and retrieval system now known or hereafter invented, without prior written permission of the California Commission on Peace Officer Standards and Training (POST), with the following exception:

California law enforcement agencies in the POST peace officer program and POST-certified training presenters are hereby given permission by POST to reproduce any or all of the contents of this manual for their internal use.

All other individuals, private businesses and corporations, public and private agencies and colleges, professional associations, and non-POST law enforcement agencies in state or out-of-state may print or download this information for non-commercial use.

Infringement of the provisions expressed here and on the POST website under *Terms and Conditions* will be pursued in a court of law. Any questions about duplication and protection of this publication and exceptions may be directed to the Publications Manager.

All photos are used with permission.

## POST MISSION STATEMENT

The mission of the California Commission on Peace Officer Standards and Training is to continually enhance the professionalism of California Law Enforcement in serving its communities

iv

*This page is intentionally blank.*

# POST Commissioners

### CHAIR
**Geoff Long**
Public Member

### VICE CHAIR
**Rick Braziel**
Educator, Humboldt State University

**Alan Barcelona**
Special Agent, Department of Justice

**Ingrid Braun**
Sheriff, Mono County

**Jim Cooper**
Sheriff, Sacramento County

**Justin Doering**
Senior Deputy Sheriff, Ventura County

**P. Lamont Ewell**
Public Member

**Kelly Gordon**
Chief, Santa Barbara Police Department

**Jacob Johnson**
Officer, California Highway Patrol

**Shannan Moon**
Sheriff, Nevada County Sheriff's Office

**Tina Nieto**
Sheriff, Monterey County

**Benjamin Therriault**
Sergeant, Richmond Police Department

**Rob Bonta**
Ex-Officio Member, Attorney General, Department of Justice

# ACKNOWLEDGMENTS

POST appreciates the dedication of the 2023-2024 subject matter expert group who assisted in the update of this guideline.

**Sergeant Aron Algren**
Los Angeles Police Department

**Sergeant Jason Arnotti**
Carlsbad Police Department

**Lieutenant Gary Aulis (Retired)**
Fontana Police Department

**Lieutenant Ron Cloward**
Modesto Police Department (retired)

**Sergeant Raymond Cota**
Monterey Park PD

**Sergeant Daniel Dayton**
Los Angeles Port Police

**Assistant Chief Mike Gleckler**
California State Parks

**Sergeant Michael Goosby (Retired)**
Los Angeles Police Department

**Officer Landon Matson**
California Highway Patrol

**Sergeant Rebecca Mondon**
 Cypress  Police Department

**Sergeant Ryan McWilliams**
Bakersfield Police Department

**Elizabeth Norton, Esq.**
Butte County District Attorney's Office

**Captain Brad Meyer**
Butte County Sheriff's Office

**Officer Aaron Plugge**
Redondo Beach Police Department

**Bruce Praet, Esq.**
Ferguson Praet & Sherman

**Denise Lynch Rocawich, Esq.**
Jones & Mayer

**Lieutenant Casey Thomas**
California Department of Fish and Wildlife

**Sergeant Paul Warren**
Sacramento County Sheriff's Office

**Sergeant Ernest Wolosewicz (Retired)**
Long Beach Police Department

# FOREWORD

In 1991, a group of K-9 Officers, Law Enforcement Managers, and K-9 Trainers from throughout the state met to discuss the need for K-9 Team Standards in California. The group believed that local liability would be reduced if statewide K-9 Team Standards were available. They further believed that these standards, to be acceptable and have an impact, should be supported by the Commission on Peace Officer Standards and Training (POST).

In February 1992, POST brought this committee and other interested experts together, and they agreed to develop guidelines in the areas of Obedience, Search, Apprehension, Handler Protection, Handler Selection, and Evaluation. After initial development work and following several reviews which resulted in consensus, the proposed guidelines were submitted to and approved by the POST Commission in July 1992.

Following Commission action, POST brought the subject matter experts together again and developed suggested scenarios to test the recommended minimum K-9 Team Standards contained within the approved guidelines. POST developed a one-day Evaluator's Course and accompanying evaluation forms to train officers evaluating K-9 Teams.

Updates to this document aim to refine and streamline the guidelines. POST recognizes that agencies utilize K-9 teams in various capacities and with differing expectations.

Additionally, many more specialized K-9 team functions have developed in the decades since POST first created the guidelines. These guidelines recommend minimum training and evaluation benchmarks for K-9 Patrol and Detection functions. They are intended to assist agencies with recommendations to develop policies for the use and training of K-9 teams.

Questions regarding the POST Law Enforcement K-9 Guidelines should be directed to the Management Counseling and Projects Bureau at (916) 227-4852. Questions regarding certification of K-9 training courses should be directed to the Training Delivery and Compliance Bureau at (916) 227-4863.

**Manuel Alvarez Jr.**
POST Executive Director

*This page is intentionally blank.*

# INTRODUCTION

These guidelines are designed to assist agencies with minimum training and performance standards for patrol and detection K-9 teams. Patrol K-9 teams should meet minimum standards regarding obedience, search, apprehension, control, de-escalation, and tracking/trailing.

Detection K-9 teams should meet minimum standards for detection of the odor(s) that the K-9 is trained to detect.

This categorization (patrol and detection) is intentionally basic. POST recognizes that there are many specializations among law enforcement K-9s. Specializations include explosives detection, cadaver detection, search and rescue, SWAT, and airport operations, among others.

These guidelines recognize that the use of K-9s by law enforcement personnel is of important concern to the community, including law enforcement, and that safeguarding the life, dignity, and liberty of all persons, without prejudice to anyone, should be priority.






*This page is intentionally blank.*

# CONTENTS

**POST Mission Statement**.................................................................................................**iii**

**POST Commissioners**.....................................................................................................**v**

**Acknowledgments**.........................................................................................................**vi**

**Foreword** ......................................................................................................................**vii**

**Introduction** ................................................................................................................**ix**

**General Training Guidelines** .......................................................................................**1**

    Minimum Standards for Basic K-9 Handler/Team Training..................................................... 1

**K-9 Team Evaluators** ...................................................................................................**2**

**Patrol Guidelines** ........................................................................................................**3**

**K-9 Team Competencies** .............................................................................................**4**

**Patrol Scenarios for K-9 Team Evaluations** ...............................................................**5**

    Obedience ................................................................................................................................ 5

    Search/Apprehension .............................................................................................................. 6

    Call-off..................................................................................................................................... 7

    Control and De-escalation ....................................................................................................... 7

**Detection Guidelines**...................................................................................................**8**

    Search....................................................................................................................................... 8

    Detection ................................................................................................................................. 8

    Detection Scenarios for K-9 Team Evaluations........................................................................ 9

    Tracking/Trailing Guidelines................................................................................................... 10

    Tracking/Trailing Scenarios for K-9 Team Evaluations............................................................ 10

*This page is intentionally blank.*

# GENERAL TRAINING GUIDELINES

## *Minimum Standards for Basic K-9 Handler/Team Training*

1. The K-9 handler should demonstrate an understanding of current laws and competence in exercising sound judgment and critical decision-making when using force to include during the training and development of a law enforcement K-9.

2. The K-9 handler/team should successfully pass an evaluation prior to law enforcement deployment. For purposes of these guidelines, an "alert" is behavior recognized by the handler that indicates the presence of a target odor.

3. In-service K-9 teams should complete 20 hours of documented training monthly to maintain basic patrol and/or detection proficiency.

4. A K-9 team with multiple/added specializations (e.g., SWAT K-9, bomb detection, search and rescue) may require additional training to maintain proficiency.

5. POST recommends annual recertification for the K-9 team.

6. If a K-9 team member has an extended absence from training, POST recommends that the team member be re-evaluated by a trainer prior to service being reinstated.

 

# K-9 TEAM EVALUATORS

In order to meet POST law enforcement K-9 guidelines, K-9 teams shall be assessed by an  evaluator prior to general law enforcement deployment and at least once annually.

The evaluator and handler should not have a monetary interest in the breeding/selling/training of the K-9 being evaluated. This is to preserve the highest standards of professionalism and to avoid any perceived conflict of interest between the evaluator and the K-9 team.





# PATROL GUIDELINES

The release of a K-9 to search for or apprehend a suspect should be based upon the handler's reasonable belief that the suspect has committed, is committing, or is threatening to commit a serious offense under any of the following conditions:

1. There is a reasonable belief that the suspect poses an imminent or immediate threat of violence or serious harm to the public or an officer.

2. The suspect is physically resisting or threatening to resist arrest and the use of a K-9 reasonably appears necessary to overcome such resistance.

3. Officers reasonably believe the suspect is concealed in an area where entry by a person would pose a threat to the safety of officers or the public.

4. Unless the handler reasonably believes that it would pose an imminent threat of danger to the officer or other persons or substantially increase the risk of a suspect's escape, a warning, clearly audible, within the deployment area announcing the potential release of a police K-9 if the suspect does not surrender should be given prior to the release of the K-9.

5. Once given, the handler should allow a reasonable opportunity for the suspect to comply with any warning, if feasible as defined in Government Code section 7286.

In general, the K-9 should not be used for crowd control at an assembly, protest, or demonstration.



# K-9 TEAM COMPETENCIES

The following four K-9 team competencies outline minimum "patrol" performance standards that a K-9 team should be able to demonstrate. Testing for the following four competencies should be conducted in an environment closely simulating realistic job conditions and distractions.

1. **Obedience**

   The handler will demonstrate the ability to control the K-9 during an obedience performance test.

   a. The K-9 will perform a basic routine of left, right, and about turns, at normal, and quick pace, while on a leash.

   b. The K-9 team will perform basic tactical movements and control.

2. **Search**

   Under the direction and control of the handler, the K-9 will independently locate a hidden agitator/decoy in a structure or building and in an outdoor area within a reasonable amount of time.

   a. The K-9 will "alert" the handler after finding the agitator/decoy. Prior to the release of the K-9 , an announcement of intended use will be given. At least one search will be a civil find using no equipment on the agitator/decoy.

   b. The K-9 will locate a hidden agitator/decoy in a structure or building with multiple rooms and hiding locations places and "alert" the handler.

   c. The K-9 will locate a hidden agitator/decoy in a large outdoor area with multiple hiding locations and "alert" the handler.

3. **Apprehension**

   Under the direction of the handler and while off-leash, the K-9 will pursue and apprehend an agitator/decoy.

   a. The K-9 team will demonstrate a "pursuit and call off" prior to apprehension.

   b. On command from the handler, the K-9 will pursue and apprehend the agitator/decoy.

   c. From a reasonable distance and within a reasonable amount of time, on verbal command only, the K-9 will cease the apprehension.

   d. Handlers must demonstrate a tactical release from a prone agitator/decoy.

   e. Handlers will identify supplemental equipment they will have available to aid with the release and demonstrate its use. Supplemental equipment may include but are not limited to breaker bar, e-collar, pinch collar or other devices.

4. **Control and De-escalation**

   The K-9 will remain under control while the handler attempts to gain compliance from the agitator/decoy.

# PATROL SCENARIOS FOR K-9 TEAM EVALUATIONS

The following are scenarios for a K-9 team evaluation in each of the competency areas. These scenarios contain minimum elements for an evaluation.

1. These exercises should be demonstrated in an environment closely simulating realistic job conditions and distractions without the use of a muzzle.

2. The evaluating instructor will be fully apprised of the pertinent agency policies and regulations prior to the commencement of all exercises conducted. The "correct" response or reaction of the handler, the K-9, or the two acting together, may differ from agency to agency, based on prevailing agency policy.



## *Obedience*

Handlers will report to the evaluator with the K-9 on a leash. At the direction of the evaluator, the team will complete the following exercises as called for by the evaluator. During the exercise, the K-9 will be under the handler's control at the "heel" position.

At the "forward" direction of the evaluator, handlers will proceed ahead with their K-9s at the "heel" position and at a normal, and/or quick pace at the direction of the evaluator. The evaluator will direct the handler K-9 team through a series of turns and movements including the following:

1. On a leash:
   a. Two right turns
   b. Two left turns
   c. Two about-turns
   d. Two stop/sits
   e. Two stop/downs

2. Off-leash tactical obedience:

This exercise will be performed using four stations or points of cover. The K-9 team starts from a position of cover near station number one. The K-9 is placed in a stationary position as the handler moves to the second station, leaving the K-9 behind. Once the handler is at the second station in a position of cover, the K-9 is called to a heel. From the second station, the handler has the K-9 heel to the third station. At the third station, the handler again assumes a position of cover, keeping the K-9 beside the handler in a controlled position. The handler leaves the K-9 and moves to the fourth station and assumes a position of cover. The handler recalls the K-9 to a heeling position, concluding the exercise. The K-9 must not break from stationary positions until called upon by the handler.

## Search/Apprehension

During all the below exercises, a minimum of two people, which may include the evaluator, shall be present to simulate the presence of a search team. The K-9 should maintain neutrality to all persons present other than the agitator/decoy.

Based on the following criteria listed in this section, the evaluator will develop the certification scenarios which encompass the skills listed below.

The K-9 will demonstrate the following:

1. **Building Search**

   A structure or building with multiple rooms and hiding locations in which the K-9 will locate a hiding agitator/decoy. This scenario shall be demonstrated off-leash.

2. **Area Search**

   A large outdoor area with multiple hiding locations in which the K-9 will locate a hiding agitator/decoy. This scenario shall be demonstrated off-leash.

3. **Verbal Out**

   The K-9 will apprehend the agitator/decoy from a distance no less than ten yards from the handler. The handler, using verbal commands only, will have the K-9 release and recall back to the handler. This scenario shall be demonstrated off-leash and without the use of an e-collar correction.

4. **Tactical Release**

   The handler will demonstrate the ability to physically remove the K-9 from the apprehension of an agitator/decoy, in a reasonable amount of time, in two separate scenarios. For the first, the handler will demonstrate the ability to physically remove the K-9 from an agitator/decoy in a prone position. For the second, handlers will identify a supplemental method they will use in aiding with the release and demonstrate its use in removing the K-9 from an agitator/decoy. Supplemental methods may include but are not limited to a breaker bar, e-collar, pinch collar or other devices or techniques.

5. **Inaccessible Find**

   The alert to the presence of an inaccessible agitator/decoy with no equipment present. After the handler identifies the alert to the evaluator, the K-9 will then be recalled back to the handler's position. This scenario shall be demonstrated off-leash as part of the building search or area search, as determined by the evaluator.

## *Call-off*

This function is critical and separates the K-9 from all other less-than-lethal force options in that the handler has the ability to call off the K-9 prior to making contact with the agitator/decoy, within reason, to avoid a use of force.

1. This exercise will simulate a directed apprehension and will be conducted off-leash and without the use of an e-collar correction.

2. The K-9 will be sent on a directed apprehension, from approximately 30 yards, on a visible and accessible agitator/decoy.

3. Once the K-9 is in the pursuit and committed to the agitator/decoy (approximately halfway), the handler will call off the apprehension using only voice commands.

4. The K-9 is not allowed to make contact with the agitator/decoy.

5. The K-9 may or may not be recalled to the handler at the discretion of the evaluator.

The scenario will conclude when the K-9 is under physical control of the handler.



## *Control and De-escalation*

The K9 handler will approach the agitator/decoy. The K-9 will remain under control while the handler attempts to gain compliance from the agitator/decoy for a minimum of 20 seconds. The circumstances of the scenario are at the discretion of the evaluator.



# DETECTION GUIDELINES

The following K-9 team competecy outlines minimum "detection" performance standards that a K-9 team should be able to demonstrate when adopting these guidelines.

## Search

While demonstrating reasonable control and coordination between the handler and the K-9 used in the detection, the K-9 must find (within a reasonable period of time as determined by the evaluator) the odor(s) they have been trained to find in the environment(s) they have been trained to search.

1. The K-9 should not "alert" to anything that it is not trained to find

2. A false "alert" (as determined by the evaluator) is a failure

3. The agency will designate what odors may be used



## Detection

The evaluator will be fully apprised of the pertinent agency policies and regulations prior to the commencement of the exercise. The "correct" response or reaction of the handler, the K-9, or the two acting together, may differ from agency to agency, based on prevailing agency policy.

1. While demonstrating reasonable control and coordination between the handler and the K-9 used in detection, the K-9 must find—within a reasonable period of time—the odor(s) identified.

2. There should be a recognized signal "alert" from the K-9 to the handler which indicates that the K-9 has located each odor.

3. The handler must be able to interpret the K-9's "alert" clearly enough to be able to inform the evaluator of the substance's location.

4. Once a handler has signaled their K-9's "alert" to the evaluator, the exercise is complete.

5. The handler must demonstrate the ability to control the K-9 fully throughout all phases of the search. The evaluation should contain at least one trained odor in each environment evaluated.

6. To ensure adequate scent dispersion, setup time for each sample of trained odor should be a minimum of 30 minutes prior to the actual search.

7. The actual target trained odor should be present for the evaluation of trained odor detection.

## *Detection Scenarios for K-9 Team Evaluations*

The evaluator shall set up hides in test environments suitable to the K9 team being tested. Environments may include but are not limited to:

1. **Building Search**

   A minimum of three rooms, only one trained odor should be placed in any given room; one room must be blank with no trained odors present

2. **Open Area Search**

   Large, exterior area with one trained odor

3. **Vehicle Search**

   Minimum of three vehicles; only one trained odor should be placed on any vehicle; one vehicle must be blank with no trained odors present

4. **Other Search Area**

   As determined by the evaluator based on the needs of the agency





## Tracking/Trailing Guidelines

### Minimum Standards for Tracking/Trailing Performance Standards

The purpose of this guideline is to determine the K-9's ability to follow the track/trail.

While demonstrating reasonable control and coordination between the handler and the K-9, the K-9 must find the article or odor to be tracked/trailed within a reasonable amount of time.



## Tracking/Trailing Scenarios for K-9 Team Evaluations

1. The evaluator will have the track/trail laid in an environment suitable for the working conditions of the team being evaluated.

2. The evaluation must consist of two turns, a minimum of 100 yards, and one article or odor (if articles are trained).

3. The K-9 team will not be given the exact location of the start of the track/trail, but only the general area and the direction of travel by the evaluator.

4. The K-9 must provide an indication recognized by the handler when the article or odor is located.

